401 A.2d 426.

STATE *vs.* DAVID CONTILDES.

MAY 1, 1979.

PRESENT: Bevilacqua, C.J., Joslin, Kelleher, Doris and Weisberger, JJ.

KELLEHER, J. The defendant, David Contildes (Contildes), is before us on his appeal following his conviction by a

Superior Court jury of a variety of charges, all of which arose from the March 11, 1976 Thursday evening holdup of the Marquette Credit Union's Cumberland branch office. The appeal revolves around one single issue, to wit, whether Contildes' constitutional right to a fair trial was violated by the prosecution's alleged failure to reveal to him certain exculpatory evidence.

The exculpatory evidence consists of a written statement given to the police by Albert E. Forkey (Forkey), who in the winter of 1976 worked in Woonsocket as the bartender at the Dugout Cafe (Dugout). The Dugout played an important before-and-after role in the March 11 robbery. It will be obvious to the reader that there were times when some of the Dugout's clientele thought and talked about things other than batting averages, pitching performances, and the Red Sox' chances of ever again winning an American League pennant.

The prosecution's star witness was John B. Daniels (Daniels). Daniels was a coindictee of Contildes, but 2 days before trial began he withdrew his not-guilty pleas and in their place substituted twelve nolo pleas. He gave the jury a blow-by-blow description of the events which led to the courtroom confrontation between Daniels and Contildes. According to Daniels, he and Contildes got together at the Dugout on March 10 and planned the holdup. On the following day at about 6:15 p.m. they drove to the parking lot across the street from the Dugout, picked up a stolen light blue 1965 Pontiac Catalina, and headed for Marquette's Cumberland branch. Once the duo arrived at the credit union, they put on ski masks and then went about their appointed tasks. Daniels took care of the crowd-control problem as he leveled a .44 magnum rifle at the customers and employees. Contildes took care of the collection as he vaulted over the counter and stuffed all of the available cash into a cloth bag. The police arrived on the scene just as Daniels and Contildes sped away. The noise from an exchange of gunfire between the bandits and the police caused several people who lived alongside the credit union to take a

look at what was going on. Two of the onlookers were teen-agers. They appeared in court and described the getaway vehicle as a 1967 light blue Pontiac bearing a Rhode Island registration plate which read: "SO 321."

Among the other Dugout patrons were Steven Cook (Cook) and Robert E. Perrault (Perrault). Cook testified that on the night before the holdup Contildes had agreed to pay him $200 if Cook would furnish him with a stolen car. The next day Cook and Perrault stole the Catalina and attached to its rear bumper a stolen Rhode Island license plate that contained two initials and three numbers. Perrault could not remember the exact sequence, but he did say that the plate contained an "S" and the figure "321." Cook parked the Pontiac in a parking lot across the street from the Dugout. He and Perrault repaired to the bar. Contildes showed up at the Dugout at about 6 p.m. After being shown the Pontiac, he left the area in his own automobile. Sometime later when Cook looked out the window, he saw Contildes and another individual in the parking lot. A bit later when Cook gave the area a second look, he noticed that the Pontiac had dis-appeared. Testimony by Cook and Perrault indicated that Contildes reappeared at the Dugout somewhere within the 7:30 to 8 p.m. time range.

Perrault reported that in the ensuing hours after Contildes' return, he (Perrault) operated a shuttle service between the Dugout and various points in the Woonsocket-Cumberland area. Contildes was first taken to his Woonsocket apartment for a change of clothes. On the way, he told his companions that they had just "knocked off a loan company." After the trio returned to the Dugout, they once again journeyed over to Cumberland for the express purpose of picking up Daniels at a cemetery. On their way, they stopped at a parking lot of a Woonsocket bowling alley, where Contildes had aban-doned the stolen Pontiac. He removed the stolen plate from the Pontiac and returned to Perrault's automobile. As they proceeded along Woonsocket's Main Street bypass, Contildes folded the plate in half and pitched it into the Blackstone River. At about 11 p.m. they made the cemetery pickup and

returned to Contildes' apartment. As they traveled the highways, the car radio informed them that the police had reported the credit union robbery to have netted the thieves about $2,000.

At the apartment Daniels put the credit union's cash on the table, and the loot was divided. Cook and Perrault each received $100, Daniels and Contildes split the balance of approximately $1,200. Nobody sought an explanation of the $600 difference between the $2,000 police report and the $1,400 brought to the apartment by Daniels.

Perrault then drove Cook, Daniels, and Contildes to the Dugout. Following a midnight libation, Daniels and Contildes took leave of the establishment. As they did, Daniels was arrested by the Woonsocket police. A search of Daniels produced $623 in cash. A check of the credit union's records revealed that $200 of that amount had been in the tellers' stations at the time of the robbery.

The evening of March 11, 1976, marked a high point in the Dugout's weekly social calendar because the bar's pool tournament took place during that time. Forkey, the bartender, testified that twenty-four players using one table participated in a tournament which began at 7 p.m. and ended 2 hours later. When asked if Contildes was present for the entire tournament, Forkey replied: "I don't know for sure. To the best of my knowledge he was there from seven to nine for the tournament." During cross-examination Forkey was asked whether Contildes, Cook, and Perrault were in the bar at 6 p.m., and he replied that it was "possible," but he could not swear to it because the large turnout of spectators and participants made it difficult "to keep track of them all." When confronted by the defense with a statement in which he told the police that Contildes, Cook, and Perrault had remained at the Dugout from 6 p.m. until midnight, Forkey replied: "I believe they were, if that's what it says there." The bartender clarified his earlier testimony about Contildes' being in and out of the bar by stating that the ins and outs occurred during the post-tournament period. On redirect

examination, Forkey conceded that someone could have left the Dugout and returned without his ever being aware of such an event.

The defense presented an alibi witness. Donald Marks (Marks) told the jury that his tournament opponent was Contildes. Marks stated that Contildes arrived at the bar shortly after 6 p.m. and he and Contildes confronted each other twice during the tournament. Each time Contildes was victorious. If Marks is to be believed, while Daniels was shooting at the police in Cumberland, Contildes was in Woonsocket shooting pool.

The owner of a 1965 Pontiac Catalina, whose car was stolen from the Woonsocket Plaza parking lot on March 11, 1976, recovered his car the following day from the state police. It was the getaway vehicle. The owner told the jury that while he considered his car to be light green, concededly it could be described as light blue. The police recovered the folded plate. It was issued by the Rhode Island Registry of Motor Vehicles and reads "SU 321."

The statement given to the police by Forkey was introduced into evidence. It refers to the night of March 11 and states as follows:

> "Steve Cook, Dave Contildes, and Bob Perrault were here between the hours of 6 and 12 except for Steve Cook who was here at closing time at 1 o'clock at which time the State and city police came in and asked if I would bring my bills to the station to be examined which I did. Contildes was here to play his games in the pool tournament that begins at 7 to 9 but I could not say that he was here at 7 o'clock or not but he was in and out a few times in the course of the night. Dave Contildes played two games of pool in the tournament against Don Marks. [T]he tournament is run by Dick Thifeault. [H]e would probably have a rough estimate of the time he played his games."

Contildes' counsel classifies this document as being

exculpatory because it indicates his client was in the bar at various times during the night of the robbery and identifies two individuals who might have been able to corroborate this fact. Although Contildes failed to make any effort for pretrial discovery,[1] he now contends that the state's failure to provide him with this statement prior to trial "significantly prejudiced" the full development of his alibi defense, thereby depriving him of a fair trial.

We have previously recognized that the suppression or non-disclosure of evidence favorable to the accused can give rise to an error of constitutional proportions. *In re Ouimette*, 115 R.I. 169, 174, 342 A.2d 250, 252 (1975). In *Ouimette*, we discussed *Brady* v. *Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), where the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87, 83 S. Ct. 15 1196, 10 L. Ed. 2d at 218. However, we noted that *Brady* left two questions unanswered: first, just what evidence was "material" enough to require a new trial, and second, whether its holding was based solely upon the fact of a specific request for clearly defined evidence.

In *Ouimette*, we pointed out that the prosecutorial duty to disclose serves not only as a reminder to counsel for the state that the primary purpose of a criminal trial is the search for truth but also acts as a safeguard against the injustice which can arise when a guilty verdict results from a situation where relevant facts are not produced for the factfinders' consideration. In attempting to balance these goals against society's

---

[1]Contildes' appellate counsel was not his trial counsel. The absence of any effort in the discovery area might have been part of trial strategy. If Contildes had sought discovery pursuant to the terms of Super R. Crim. P. 16, he would have been obligated, upon written request, to furnish the state with the evidence and information he expected to use at the trial, including the names and addresses of any witnesses who might be presented to establish an alibi defense. *State* v. *Silva*, 118 R.I. 408, 409, 374 A.2d 106, 107 (1977).

interest in the prompt final disposition of criminal prosecutions, we adopted the "significant chance" rationale which was employed by the Second Circuit in *United States v. Kahn,* 472 F.2d 272 (2d Cir. 1973). In *Kahn,* the court took the position that where there is no intentional deceit and no pretrial request for specific evidence, but hindsight discloses that the defense could have put the evidence to good use, the defendant, while not obliged to show the probability of a different verdict upon retrial, must show there is a significant chance that the use and development of the withheld evidence by skilled counsel at trial would have produced a reasonable doubt in the minds of enough jurors to avoid a conviction. *In re Ouimette,* 115 R.I. at 179, 342 A.2d at 254-55.

Almost a year after our decision in *Ouimette,* the Supreme Court expanded on the constitutional requirement of pretrial discovery. In *United States v. Agurs,* 427 U.S. 97, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976), the accused was convicted of second-degree murder after a jury refused to find that she had acted in self-defense. Although no pretrial request was made, the accused argued that she was denied a fair trial by the prosecutor's failure to disclose certain information about the victim which tended to support her theory of self-defense. Before defining the standard of materiality giving rise to the prosecutor's constitutional duty to volunteer exculpatory matter to the defense, the Court commented briefly on the function of the request.

Where there is a specific request informing the prosecutor of just what evidence the defense desires, the Court concluded that failure either to furnish the information or to submit the problem to the trial judge would seldom, if ever, be excused when the evidence is material or there is substantial basis for claiming materiality. On the other hand, when the defense makes a general request for "all *Brady* material," the prosecutor's duty to disclose can only derive from the "obviously exculpatory" nature of the evidence in his possession. The Court applied the same rationale to cases

in which no request is made since in both instances the prosecution has little, if any, notice of what the defense desires.

There being no request made by the defense in *Agurs*, the Court articulated a standard of materiality virtually identical to that adopted by us in *Ouimette*.[2] According to *Agurs*, materiality is the keystone of the constitutional duty to disclose and is measured by the following standard:

> "if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt." *Id.* at 112-13, 96 S. Ct. at 2402, 49 L. Ed. 2d at 355.

We now consider Contildes' contention in the light of this guideline.

Contildes identifies the two additional witnesses listed on Forkey's statement as his adversary, Marks, and the tournament director, Dick Thifeault. However, as noted earlier, the jury heard Marks' testimony about Contildes' whereabouts. Forkey's statement indicates that Thifeault "would probably have a rough estimate" of the time when Contildes participated in the tournament. Again, Marks had

---

[2] In *In re Ouimette,* 115 R.I. 169, 179, 342 A.2d 250, 254-55 (1975), we ruled that where there is an inadvertent suppression of evidence which hindsight shows "could have been helpful," a retrial will be ordered only if the defendant shows there was a "significant chance" that the withheld evidence in the hands of skilled counsel would have caused the jury to return a verdict of not guilty. We think that the distinction between *Ouimette's* "significant chance" and *Agur's* existence of a "reasonable doubt that did not otherwise exist" is purely semantic even though Mr. Justice Marshall in his *Agurs* dissent may think otherwise.

already given this information to the jury, and at this particular point in time no one, including Contildes, knows what, if anything, Thifeault can offer by way of testimony concerning Contildes' presence at the Dugout during the time the holdup was taking place in Cumberland.

One who seeks to make a successful claim under the doctrine of *Brady* and its progeny must establish three factors: the suppression of evidence, the favorable character of the evidence of the defense, and the materiality of such evidence. *Moore* v. *Illinois*, 408 U.S. 786, 794-95, 92 S. Ct. 2562, 2568, 33 L. Ed. 2d 703, 713 (1972). Here, there was no suppression of the evidence. The statement was furnished to the defense. The prosecutor, acting pursuant to the provisions of Super. R. Crim. P. 26.1(d), furnished the statement *immediately at the conclusion of the state's cross-examinaton of the bartender. Forkey appeared as a witnesss on the morning of October 19, 1976. The defense did not begin its presentation of evidence until the afternoon of the following day, when apparently the defense made no effort to contact Thifeault. Now, in the spring of 1979, there is absolutely no indication that Thifeault's testimony would be favorable to the defense or material to the issues at hand. While we commend the diligence and resourcefulness of the advocacy of Contildes' present counsel, we find no reason either to disturb the findings made by the jury or to fault the trial justice in ruling as he did.

The defendant's appeal is denied and dismissed, and the judgment of conviction appealed from is affirmed.