409 A.2d 551.

STATE *vs.* GEORGE F. NEARY, *et al.*

DECEMBER 24, 1979.

PRESENT: Bevilacqua, C.J., Kelleher, Doris and Weisberger, JJ.

WEISBERGER, J.   Defendants George F. Neary (Neary) and Roland F. Martell, Jr. (Martell) were indicted on September 2, 1976, by the grand jury on charges of robbery in violation of G.L. 1956 (1969 Reenactment) §11-39-1, carrying a pistol without a license in violation of §11-47-8, as amended by P.L. 1975, ch. 278, §1, assault with intent to murder in violation of §11-5-1, assault with a dangerous weapon in violation of §11-5-2, and assault with a dangerous weapon in a dwelling house in violation of §11-5-4. Prior to trial, a justice of the Superior Court granted defendant Martell's motion to sever a companion charge of possession of a firearm after a previous conviction of a crime of violence, in violation of §11-47-5.

Trial was held in Providence County Superior Court before a jury which returned verdicts of guilty as charged on February 8, 1977, with respect to the three counts of carrying a weapon without a license, assault with intent to murder, and assault with a dangerous weapon, after the trial justice had granted defendants' motions for acquittal on the charges of robbery and assault with a dangerous weapon in a dwelling house. The defendants subsequently filed motions for new trial, which motions the trial justice denied, and judgments of conviction were entered. Both defendants join in appealing from these judgments.

The events which culminated in the grand jury's indictment and defendants' subsequent convictions began during the early morning hours of July 6, 1976, when Thomas Edward Dauphinee (Thomas) heard a knock on the door of the apartment he shared with his father, Bernard, and went to answer it. Defendant Martell grabbed him and pulled out a gun. After Thomas knocked the weapon from defendant's grasp, a number of encounters and struggles ensued, both in-

side and outside of the apartment, involving Thomas, Bernard, both defendants, and two other individuals. In the course of these confrontations, Thomas was hit over the head with a beer bottle, and Bernard was severely beaten with a baseball bat, suffering injuries which necessitated a hospital stay of several months' duration. The defendants' grievance with the Dauphinee family seems to have stemmed from the fact that Thomas and another person who participated in the incident had earlier borrowed Martell's car and allegedly damaged it.

Soon after the assaults, while in the hospital, Thomas viewed an array of thirteen photographs, two of which, having just been taken that morning, depicted defendants Neary and Martell with the date July 6, 1976, conspicuously positioned upon them. A detective had chosen the remaining photographs at random, making no attempt in his process of selection to approximate the likenesses of the men only just then arrested for the crimes. At the voir dire hearing conducted to determine the admissibility of Thomas' in-court identification of defendants, the trial justice ruled that the photographic display viewed by the victim had been an impermissibly suggestive one, but that the in-court identifications, nevertheless, had been predicated upon independent sources;[1]  and the photographic identification was not such as to have led to the likelihood of irreparable mistaken identification.[2]

---

[1]  The trial justice found that the victim had sufficient opportunity to observe both defendants clearly on the night of the incident. Additionally, Thomas Dauphinee had known Martell personally prior to the episode here involved, and he had also seen Neary previously on at least one occasion in a bar.

---

[2]  The trial justice apparently applied the standard enunciated in *Simmons* v. *United States*, 390 U.S. 377, 88 S. Ct. 967, 19 L. Ed. 2d 1247 (1968), wherein the Court held that "each case must be considered on its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Id.* at 384, 88 S. Ct. at 971, 19 L. Ed. 2d at 1253.

During the suppression hearing, it was mentioned by defense counsel that Thomas had also examined approximately six to eight "mug books" directly after the assaults and somewhat earlier in time than the photographic array produced by the detective.[3]   After regarding the "mug books" for thirty or forty minutes, the victim failed to make any positive identification; but the police officer who had conducted the mug-book display testified that he did not know whether or not the pictures of either or both defendants had been among those contained in the "mug books" shown to Thomas. Defendant Martell moved for production of the "mug books," but the trial justice refused to order such production, noting that defendants were free to subpoena the books for trial should they desire to view and introduce them. In addition, the trial justice denied Martell's request that he defer ruling on the admissibility of Thomas' in-court identification of his assailants until he could subpoena the books. Evidently, Martell's counsel theorized that such books, if defendants' photographs were included in them, would constitute exculpatory evidence which might then impugn the reliability of the allegedly independently based identifications by Thomas.

Initially, defendants attack the evidentiary statute, G.L. 1956 (1969 Reenactment) §11-47-27, on the ground that their convictions of possession of a firearm without a license in violation of §11-47-8[4]   through reliance on the evidentiary provi-

---

[3]  Officer Zwolenski's report, which had been the subject of defendants' pretrial discovery, contained the following statement on page 6: " 'Mug books were taken into the hospital and viewed by Thomas with negative results.' " Defense counsel's comment was prompted by this excerpt.

[4]  General Laws 1956 (1969 Reenactment) §11-47-8, as amended by P.L. 1975, ch. 278, §1, provides in pertinent part:

> "License or permit required for carrying pistol - Possession of machine gun. -(a) No person shall, without a license or permit therefor, issued as provided in §§11-47-11, 11-47-12 and 11-47-18, carry a pistol or revolver in any vehicle or conveyance or on or about his person whether visible or concealed, except in his dwelling house or place of business or on land possessed by him or as provided in §§11-47-9 and 11-47-10."

sion of §11-47-27[5]   to prove the absence of the licenses violated their right to due process of the law. In short, defendants claim that §11-47-27, by itself, may not satisfy constitutionally the state's burden of proof that they had no licenses, since such absence, by definition, constitutes an element of the offense, and the state failed to adduce any evidence bearing upon the possession or lack of firearm licenses on behalf of either or both of the defendants.

Section 11-47-27 creates a statutory mandate that the carrying or use of any firearm contrary to the provisions of §§11-47-1 to 11-47-34 shall be evidence of the unlawfulness of such carrying or use, thus easing the burden cast upon the state and, further, eliminating any requirement that the prosecution advance affirmative evidence to support a negative averment -- in this instance, the lack of a license. In the event that there is evidence sufficient to warrant a finding of possession, it then becomes incumbent upon the defendant to raise the issue of the fact of his possession of a license.

The defendants have overlooked the manifest distinction between the evidentiary concepts of the burden of production and the ultimate burden of proof. While the accused never bears the burden of satisfying the factfinder of his innocence or justification, and the prosecution always bears the burden of proving the guilt of an accused beyond a reasonable doubt in a criminal prosecution (*State* v. *Brown*, 97 R.I. 95, 196 A.2d 138 (1963); *State* v. *Stallman*, 78 R.I. 90, 79 A.2d 611 (1951)), the burden of going forward with the evidence may indeed shift from side to side, and this same burden may properly devolve upon a defendant once the state

---

[5]   General Laws 1956 (1969 Reenactment) §11-47-27 reads as follows:

"Proof of unlawfulness of carrying. - No negative allegation of any kind need be averred or proved in any complaint under §§11-47-1 to 11-47-34, inclusive, and the carrying or use of any firearm contrary to the provisions of said sections shall be evidence that the possession, carrying or use of any such firearm is unlawful, but the respondent in any such case may show any fact that would render the possession, or use, or carrying of such firearm lawful."

has developed a prima facie case and has adduced evidence sufficient to make it just that the defendant be required to challenge the proof with excuse or explanation. *See Patterson v. New York,* 432 U.S. 197, 203 n.9, 97 S. Ct. 2319, 2323 n.9, 53 L. Ed. 2d 281, 287 n.9 (1977), *citing Morrison v. California,* 291 U.S. 82, 54 S. Ct. 281, 78 L. Ed. 664 (1934).

Under our statute prohibiting the carrying of a pistol without a license, the latter phrase is a descriptive negative which constitutes an essential element of the offense. The statutory inference formulated in §11-47-27, which places the burden upon a defendant to introduce evidence of circumstances that would render his possession lawful, does no more than require the defendant to raise the issue of justification by evidence peculiarly within his own control and based upon knowledge immediately within his personal reach. Such legislation which provides that proof of one fact shall be evidence of an ultimate fact in issue is merely the enactment of a rule of evidence and in no way violates one's right to due process of law. *Mobile, Jackson & Kansas City Railroad v. Turnipseed,* 219 U.S. 35, 31 S. Ct. 136, 55 L. Ed. 78 (1910).[6] In order for such a legislative presumption to survive a constitutional attack, there must exist a rational relation" 'between the facts proved and the ultimate fact presumed.'" *United States v. Gainey,* 380 U.S. 63, 66, 85 S. Ct. 754, 757, 13 L. Ed. 2d 658, 662 (1965), *quoting Tot v. United States,* 319 U.S. 463, 467, 63 S. Ct. 1241, 1245, 87 L. Ed. 1519, 1523 (1943). We recognized that standard in *State v. Tutalo,* 99 R.I. 14, 205 A.2d 137 (1964), and cautioned that "the fact inferred from the fact actually proved cannot be purely arbitrary or wholly unreasonable * * *." *Id.* at 19, 205 A.2d at 140.

---

[6] The Court in this case stated the rule in apt and succinct terms:

> "If a legislative provision not unreasonable in itself prescribing a rule of evidence, in either criminal or civil cases, does not shut out from the party affected a reasonable opportunity to submit to the jury in his defense all of the facts bearing upon the issue, there is no ground for holding that due process of law has been denied him." *Mobile, Jackson & Kansas City Railroad v. Turnipseed,* 219 U.S. 35, 43, 31 S. Ct. 136, 138, 55 L. Ed. 78, 81 (1910).

To rebut the statutory presumption of the unlawful carrying of a weapon, defendants were free to introduce evidence of the existence of their licenses to carry the weapons in question by producing such licenses or records of a proper licensing authority or other admissible testimony or documentation. At trial, the state adduced evidence sufficient to show that both defendants had been in possession of a pistol at some point during the morning's episode here at issue. From the fact of their mere possession of the weapon, the legislative rule of evidence authorized the drawing of the inference that they did in fact lack appropriate permits or licenses.

We reiterate that is is not beyond the bounds of either our own or the Federal Constitution to infer that one apprehended by police with a pistol upon his person or in his automobile has no license if he fails to produce one or even to claim at trial that such license exists. Since a presumption is an inference sanctioned by statute or judicially created rule, if the inference is a rational one, then so too is the presumption. In the light of our everyday experience and common sense, as well as the application of reasonable principles of logical analysis, we cannot say that the presumption of the want of a license from the possession of a weapon by one who offers no evidence of the existence of such license is so totally unwarranted or arbitrary as to exceed the bounds of constitutional due process.[7] *See State* v. *Maloney,* 109 R.I. 166, 282 A.2d 34 (1971); *Commonwealth* v. *Jones,* 372 Mass. 403, 361 N.E.2d 1308 (1977).[8]

---

[7] As long ago as 1881, this court held that a statute providing, in a criminal prosecution for violation of the liquor law, that evidence of the sale or keeping of intoxicating liquors for sale in any building shall be prima facie evidence that such sale or keeping was illegal, was not unconstitutional and did not effect a deprivation of life, liberty or property without due process of the laws. *State* v. *Higgins,* 13 R.I. 330, 331-32 (1881). *Accord, State* v. *Sheehan,* 28 R.I. 160, 66 A. 66 (1907) (possession of undersized lobsters).

[8] In passing upon a substantially identical issue, Mr. Justice Braucher of the Supreme Judicial Court of Massachusetts observed that:

"In sum, we think G.L. c. 278, §7, as applied to a license to carry a firearm, satisfies due process requirements. The defendant did not make any

The defendants' second major assertion of error relates to the trial justice's refusal to order production of the "mug books" that had been presented to one of the hospitalized victims with negative results. In the alternative, defendants argue that the trial justice should have deferred his ruling on the admissibility of the in-court identifications by the complaining witness until counsel had occasion to subpoena the books in order to produce them in court and introduce them in evidence for their potentially exculpatory value.

Initially, we note that since only defendant Martell objected to the refusal of the trial judge to compel production, the comtemporaneous objection rule, embodied in Super. R. Crim. P. 51, precludes defendant Neary from claiming error at this stage of the proceedings since he failed to preserve the issue properly for appeal. *State* v. *Myers,* 115 R.I. 583, 350 A.2d 611 (1976); *State* v. *Franklin,* 103 R.I. 715, 241 A.2d 219 (1968). In any event, the issue proves to be as unavailing to the defendant who raised it as to the one who failed to do so by timely objection.

"Unquestionably, an accused in a criminal case must be protected in his constitutional right to procure such witnesses and evidence as are necessary to permit a full defense to the offense charged, and a reasonable adjournment of the trial may be necessary to effectuate that right." *State* v. *Carillo,* 113 R.I. 32, 39-40, 317 A.2d 449, 454 (1974). But a request for a continuance is well within the discretion of the trial justice and not allowable as a matter of course, particularly where defense counsel has failed to use due diligence to

---

suggestion that he had a license. We find it nearly impossible to believe that he had such a license but withheld it, subjecting himself to the risk of a mandatory term of imprisonment. If he did so, for example, for the purpose of establishing a legal principle, the words of the Supreme Court in *Williams* v. *Florida,* 399 U.S. 78, 82 (1970), are apposite: 'The adversary system of trial is hardly an end in itself . . . .' Such an absurd game does not contribute to a search for truth; instead, it increases the risk of convicting the innocent and acquitting the guilty. We find no unfairness in our traditional rule." *Commonwealth* v. *Jones,* 372 Mass. 403, 409, 361 N.E.2d 1308, 1312-13 (1977).

obtain such evidence and when its absence is fairly attributable to the defendant's fault. *State* v. *Carillo, supra.*

Doubtless the nondisclosure of evidence favorable to the accused may constitute a procedural failure of constitutional proportions. *Brady* v. *Maryland,* 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963); *In re Ouimette,* 115 R.I. 169, 342 A.2d 250 (1975). In the case at bar, however, the record would indicate that the prosecution, in response to a defense pretrial request for discovery, made available the officer's report which contained a reference to the use of the "mug books" in issue with negative results. The record further indicates that this report was made available prior to the commencement of trial, and yet no request for production of the "mug books" was made until after the trial had commenced. At that point, the trial justice properly suggested that defendant Martell subpoena the books if he desired to make use of them.[9]

Not only did counsel for defendant make no attempt to introduce the allegedly exculpatory "mug books" into evidence during the course of the trial, but apparently down to the present time he has made no effort to ascertain whether they even included defendants' pictures or not. Therefore, it cannot be determined on this record whether the "mug books" would contain any evidence of an exculpatory nature. Even though more than two years have passed since the date of trial, there has been no more light shed upon the subject

---

[9] Pursuant to Rule 16(g)(1) of the Superior Court Rules of Criminal Procedure, a defendant who desires to inspect books or documents is required to make a request therefor. The state is then required to respond in writing, indicating whether inspection will be permitted. In the event that inspection is not permitted, then the party who served the request may move for an order to compel compliance. In this case the record does not show that the defendant ever requested inspection of the "mug books." Therefore, a motion to compel was inappropriate. Since the trial had already begun, a subpoena duces tecum would have been the most expeditious means of bringing the "mug books" into court for use by the defendant if inspection disclosed relevance. It is also significant that the record does not show that defense counsel ever asked informally or otherwise for permission to examine the books in the police station.

than during the trial. We cannot say, therefore, that the contents of the "mug books" "would be favorable to the defense or material to the issues at hand." *State* v. *Contildes,* 121 R.I. 500, 508, 401 A.2d 426, 430 (1979). Thus, defendant Martell cannot prevail upon an issue when he has not even reached the threshold of establishing its relevance.

The defendants also take exception to the trial justice's jury instructions, which, in effect, characterized the "without a license" phraseology of §11-47-8, and, further, the exemptions found in that section and §§11-47-9 and 11-47-10 as affirmative defenses, thus shifting the burden of persuasion on those matters to defendants. Clearly, defendants insist that the absence of a license is an element of the offense which the state must prove beyond a reasonable doubt or run afoul of the due process requirements mandated in *In re Winship,* 397 U.S. 358, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970).[10]

In *State* v. *Maloney, supra,* we held in respect to this very issue that the burden of proof in a criminal prosecution remains on the state throughout the trial and never shifts to the defendant. In the case at bar, the trial justice characterized the defense of license as an "affirmative defense" which defendant had the burden of proving by a "preponderance of the evidence." This instruction was erroneous, but in view of the fact that the defendants had not raised the issue either of the existence of a license or of circumstances that would place them within one of the categories that dispensed with the license requirement, such error was harmless. The trial justice did instruct the jury that "the State has the overall and overriding burden of proving guilt of the defendant beyond a reasonable doubt." This portion of the trial justice's instructions related to the case as a whole and was an appropriate statement of the law. Thus, we hold that these defendants

---

[10]This branch of defendants' argument has its origin in the Fourteenth Amendment to the United States Constitution and art. I, sec. 10, of the Rhode Island Constitution.

had the burden to raise the issue of license or justification in the first instance. Had such issue been raised, the burden would have been upon the state, as it has always been, to prove beyond a reasonable doubt each and every element of the offense charged.[11]

For the foregoings reasons, the defendants' appeals are denied and dismissed, the judgments of the Superior Courts are affirmed, and the papers in the case are remitted to the Superior Court.

*Dennis J. Roberts II*, Attorney General, *Melanie Wilk Spencer*, Special Assistant Attorney General, for plaintiff.

*William F. Reilly*, Public Defender, *Barbara Hurst*, Chief Appellate Attorney, *Dale G. Anderson, Janice M. Weisfeld*, Assistant Public Defenders, for defendants

---

[11]*Cf. Mullany* v. *Wilbur*, 421 U.S. 684, 95 S. Ct. 1881, 44 L. Ed. 2d 508 (1975) (once issue is properly presented, prosecution must prove absence of the heat of passion on sudden provocation beyond a reasonable doubt); *State* v. *McGehearty*, 121 R.I. 55, 394 A.2d 1348 (1978) (once a defendant sustains the burden of going forward with evidence sufficient to justify existence of doubt on the issue of whether his intoxication was such as to negate his specific intent, the state has the burden to establish by proof beyond a reasonable doubt that he was not so intoxicated); *In re John Doe*, 120 R.I. 732, 390 A.2d 920 (1978) (once a defendant in a murder prosecution introduces some evidence of self-defense, the state bears the burden of persuasion to negate that defense beyond a reasonable doubt).