**STATE**

v.

**Destie VENTRE.**

No. 2006–14–C.A.

Supreme Court of Rhode Island.

Nov. 30, 2006.

Virginia M. McGinn, Providence, for Plaintiff.

John F. Cicilline, for Defendant.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## O P I N I O N

Justice ROBINSON for the Court.

The defendant, Destie Ventre, appeals from a judgment of conviction after a jury found him guilty of both second-degree murder and assault with a dangerous weapon on December 10, 2004.[1] The trial justice denied the defendant's motion for a new trial; and, on February 14, 2005, he sentenced the defendant to sixty years imprisonment, with forty years to be served at the Adult Correctional Institutions (ACI) and the balance to be suspended, with probation, for the murder. In addition, the trial justice sentenced the defendant to a consecutive term of ten years imprisonment for the assault with a dangerous weapon. The defendant filed a timely notice of appeal.

On appeal, defendant contends that the trial justice committed certain evidentiary errors that constituted violations of his Sixth Amendment-based right to cross-examination. Specifically, defendant argues that the trial justice (1) erroneously determined that certain witnesses were unavailable and then admitted their former testimony into evidence using an erroneous procedure and (2) improperly limited defendant's cross-examination of one of the victims concerning that person's arrest for gun possession.

In addition, defendant argues that the trial justice improperly precluded defendant from establishing the murder victim's criminal record for violent behavior. The defendant also contends that the trial justice erred in denying his motion for an inquiry of the jury members and his motion for a mistrial. He further argues that the trial justice erroneously instructed the jury that possession of an unlicensed firearm constitutes prima facie evidence of intent to kill—which instruction, in defendant's view, improperly shifted the burden of proof from the prosecution to him. Finally, defendant appeals from the trial justice's imposition of consecutive sentences.

---

1. The trial that resulted in the jury verdict on December 10, 2004 was not the first trial in this case. *See State v. Ventre,* 811 A.2d 1178 (R.I.2002) *(Ventre I)* (reversing judgment of conviction at the first trial and remanding for a new trial). Between the trial at issue in *Ventre I* and the trial that is the subject of this appeal, there was a second trial, which ended when a mistrial was declared.

For the reasons set forth herein, we sustain defendant's appeal, we vacate his conviction, and we remand the case to the Superior Court for retrial.

### Facts and Travel

In the early morning hours of June 6, 1998, defendant shot and killed Richard Cruso in a sequel to an argument that had occurred earlier that morning as yet another chapter in an ongoing dispute over a dirt bike. The defendant also shot Vincent Leonardo in the shoulder during the same violent encounter, but Mr. Leonardo's injury was not fatal.

At some time in the early 1990s, defendant, who had grown up in the Silver Lake section of Providence, became acquainted through mutual friends with Richard Cruso and Vincent Leonardo, who were from the Federal Hill section of Providence. At trial, defendant described Mr. Cruso as a friend, although he stated that he had had a closer relationship with Mr. Leonardo.

The defendant testified that, one day in 1997, Mr. Cruso, who knew that defendant owned a dirt bike, approached him to inquire about purchasing a dirt bike, whereupon defendant introduced Mr. Cruso to a friend of his who sold dirt bikes. The defendant testified that Mr. Cruso purchased a dirt bike from that person. The defendant further testified, however, that, at some point after the dirt bike transaction was consummated, Mr. Cruso contacted him to complain that the bike was not functioning properly. The defendant agreed to contact his friend, who agreed to fix the bike. But, after a year passed and the bike was not returned to him, Mr. Cruso became very irritated; and, when he could not reach the seller of the bike directly, he began asking defendant to contact the seller.

On the evening of June 5, 1998, at approximately 9 or 10 p.m., Mr. Cruso met Vincent Leonardo, who was a childhood friend of his, at the Acorn Social Club in Federal Hill. The pair proceeded to go from the Acorn Social Club to a club called Bootleggers in the Fox Point section of Providence, where they met two more friends from Federal Hill—namely, Lance Verrocchio and David Bettencourt. The defendant also happened to be at Bootleggers that evening with his half-brother, Ryan Guinto, and two friends. The two groups of friends noticed each other's presence at the club, but did not speak to each other while there.

The defendant testified that, shortly after leaving Bootleggers at closing time, he drove with his half-brother and his friend Greg Warren to another area of the city near a different nightclub that was closing. Upon arriving there, the three men exited from the car and stepped away in order to urinate in some nearby bushes. When he returned to the car, defendant saw Ryan Guinto, his half-brother, talking to Mr. Cruso. The defendant testified that Mr. Cruso appeared irritated about the fact that he had not been able to get in touch with defendant's friend regarding the dirt bike. The defendant further testified that Mr. Leonardo then told defendant to "get [his] boy out of his face," referring to Greg Warren, one of defendant's friends, who had walked over to Mr. Leonardo and was standing very close to him. The defendant stated that, because both Mr. Leonardo and Mr. Warren were friends of his, he stepped in between them to separate them, but a fistfight ensued, causing defendant to trip and fall onto the ground.

Vincent Leonardo was called by the state to testify at trial regarding the incidents that occurred on June 5 and 6, 1998.[2]

---

2. Mr. Leonardo had testified at the first trial of this case in 2000. At the time of the trial

Mr. Leonardo testified that, after leaving Bootleggers just before closing time, he and Mr. Cruso were driving in Mr. Cruso's car and noticed that the car in front of them was occupied by defendant and his friends, whereupon Mr. Cruso began flashing his headlights in order to get defendant to pull his car over. Mr. Leonardo further testified that Mr. Cruso explained that he wanted to talk to defendant about a situation involving a dirt bike. According to Mr. Leonardo's testimony, defendant pulled his car over and parked, and Mr. Cruso parked his car behind defendant's car. Mr. Leonardo testified that, after defendant and his friends relieved themselves in the bushes, Mr. Cruso and Mr. Leonardo stepped out of the car and Mr. Cruso began speaking to defendant and Mr. Guinto about the dirt bike.

Mr. Leonardo's testimony concerning the fistfight differed from that of defendant in that he said defendant had jumped onto his back and that, after shaking defendant off his back, he inadvertently punched defendant in the jaw while attempting to punch Mr. Warren. According to Mr. Leonardo, it was the blow to the jaw that caused defendant to fall to the ground. Mr. Leonardo testified that he and Mr. Warren continued to fight after defendant fell. As they fought, they moved twelve to fifteen feet away from where the fight began, at which time the police arrived and intervened. The defendant and Mr. Guinto left the scene, as did Mr. Cruso. Mr. Leonardo testified that, although a police officer questioned him

about the fistfight, he was ultimately allowed to leave.

The defendant testified that Mr. Leonardo had fled from the scene of the fight and that Mr. Warren was arrested by the police just before defendant drove away with Mr. Guinto. The defendant further testified that he then traveled to the home of his ex-girlfriend to get the phone number of Mr. Warren's wife, because he wanted to notify her about her husband's arrest. According to defendant, while he was at the home of his ex-girlfriend, Mr. Cruso called his pager twice. The defendant testified that he called Mr. Cruso back and that Mr. Cruso asked defendant to meet him at the Acorn Social Club, which is located on Acorn Street in Providence. The defendant agreed, and Mr. Guinto drove him there in defendant's car.

According to defendant, when he and Mr. Guinto turned onto Acorn Street, he could not see Mr. Cruso or anyone else in front of the club, so they continued driving around the block, since they were unsure as to just where Mr. Cruso wanted to meet. As they were passing in front of the club for the second time, they heard a loud crash. Mr. Guinto then stopped, and defendant exited the car and examined it to determine whether Mr. Guinto had hit something.

At that point, according to defendant, he saw Mr. Leonardo come out from behind the building with a board or a stick. The defendant testified that, as he was backing away from Mr. Leonardo, Mr. Cruso caught him from behind and began punch-

that is the subject of the instant appeal, however, Mr. Leonardo was unable to recall any details of what occurred in the evening of June 5 and the early morning of June 6, 1998. As will be discussed *infra*, that failure of recollection was the basis (1) for the trial justice's ruling that Mr. Leonardo was "unavailable" (as that term is defined in the Rhode Island Rules of Evidence) and (2) for the trial

justice's related decision to admit Mr. Leonardo's former testimony.

Throughout our factual narrative in this opinion, whenever we make mention of Mr. Leonardo's testimony, we shall be referring to that portion of his testimony at the trial in 2000 which was admitted at the trial in 2004 that is the subject of this appeal.

ing him. The defendant testified that, as Mr. Cruso was hitting him, Mr. Leonardo was beating him with the board. The defendant testified that he was afraid of Mr. Cruso and Mr. Leonardo because he knew that both had had violent encounters with other people in the past. The defendant testified that he thought the two were trying to kill him. According to defendant, Mr. Guinto was still in the car during the attack and was driving back and forth in an effort to frighten Mr. Cruso and Mr. Leonardo. The defendant testified that he was on one knee trying to get into the car, and he reached into the car and grabbed his gun, which was on the floor of the car. He then fired three shots in different directions.[3] The defendant further testified that, after firing the shots, he jumped into the car and Mr. Guinto drove away.

At trial, defendant introduced photographs of himself, which he had asked Mr. Guinto to take in order to document the injuries that he claimed to have sustained from the beating at the Acorn Social Club. The defendant denied that he had been punched in the jaw during the earlier fistfight between Mr. Leonardo and Mr. Warren.

Mr. Guinto testified at trial that defendant was knocked to the ground in the earlier fistfight between Mr. Leonardo and Mr. Warren, but that he did not observe defendant sustain a punch to the face. With respect to the events later in the evening at the Acorn Social Club, Mr. Guinto corroborated defendant's testimony that Mr. Leonardo was walking toward defendant with a board or a stick. According to Mr. Guinto, Mr. Cruso walked up to defendant with a gun in his hand and hit defendant on the side of the face with it. Mr. Guinto further testified that two other men—namely, Mr. Verrocchio and Mr. Bettencourt—came from the parking lot and began beating defendant. Mr. Guinto testified that he did not see defendant's gun, but he said that he heard four gunshots.

Mr. Leonardo's testimony about what occurred when defendant arrived at the Acorn Social Club was largely divergent from that of defendant. According to Mr. Leonardo, he and Mr. Cruso returned to the Acorn Social Club, where they met Mr. Verrocchio and Mr. Bettencourt. He testified that Mr. Verrocchio and Mr. Bettencourt were parked in their car and that he and Mr. Cruso were standing on the curb in front of the club talking to them. Mr. Leonardo further testified that he saw Mr. Guinto and defendant slowly drive by in the same vehicle in which they had been driving earlier in the evening. According to Mr. Leonardo, the pair proceeded around the block and eventually came back to Acorn Street.

Mr. Leonardo testified that he asked Mr. Cruso whether he wanted to "do anything," to which Mr. Cruso responded: "No, whatever, do whatever." Mr. Leonardo then picked up a chair that was outside of the club and threw it at the car; it hit the passenger side window, which was closed. According to Mr. Leonardo, the car then stopped and defendant jumped out of the car with a gun. Mr. Leonardo testified that he glanced quickly at the car and saw Mr. Guinto leaning over and looking out the passenger side window. When he looked again at defendant, he saw him walk towards Mr. Cruso, raise the gun so that it was pointed at his head, and then pull the trigger; but, according to Mr. Leonardo, the gun did not fire. Mr. Leonardo testified that, at that point,

3. The defendant had testified that he kept his gun, which he admitted was unlicensed, in a space beneath the dashboard of his car. It was his testimony that the gun must have fallen onto the floor of the car when his half-brother was driving back and forth.

he started walking towards defendant, who then turned to face him, clicked the safety off, and shot him in the shoulder.

Mr. Leonardo testified that defendant raised the gun again, at which point he said to defendant: "[N]o beef." He next testified that defendant then turned and shot Mr. Cruso in the chest. According to Mr. Leonardo, Mr. Cruso clutched his chest and began walking away, and Mr. Leonardo began yelling at defendant. At that point, according to Mr. Leonardo, defendant again turned the gun on him and fired a shot, but missed. Mr. Leonardo then ran towards the back of the club. From that vantage point he was still able to observe defendant walk behind Mr. Verrocchio's car and point the gun towards the ground and fire it again. He further testified that he had assumed that Mr. Cruso was on the ground, so he began yelling at defendant in an effort to divert his attention from Mr. Cruso.

When defendant turned his attention back to Mr. Leonardo, he ran to the end of the street and hid behind a house. Mr. Leonardo testified that he stayed there only briefly, and, when he heard more yelling, he walked to the parking lot of the club and observed defendant walk up to Mr. Verrocchio's car and point the gun at Mr. Verrocchio and Mr. Bettencourt, yelling repeatedly: "Do you want to die? Do you want some, too?" According to Mr. Leonardo, defendant then abruptly stopped yelling and got back into his car and drove away.

Mr. Bettencourt did not appear to testify at trial, and, as a result, his testimony from defendant's second trial was read to the jury. Mr. Bettencourt's testimony from that trial corroborated Mr. Leonardo's version of events.

Mr. Verrocchio did appear at trial, but, due to his claimed memory loss, his former testimony was likewise read to the jury.

Although Mr. Verrocchio was unable to see the shots fired, he did see a white car drive onto Acorn Street, and he saw Mr. Cruso throw his hands in the air, after which he heard three or four gunshots. Mr. Verrocchio testified that Mr. Bettencourt, seated next to him in the passenger seat, screamed, "He shot him, he shot him." Mr. Verrocchio then started the car, which caused the car radio to come on loudly, attracting the attention of defendant, who walked over and began yelling: "Are you all set? Are you all set?" According to Mr. Verrocchio, defendant then ran away.

Michael Simeone, a Johnson & Wales University student who was living in a second-floor apartment on Acorn Street on June 6, 1998, also testified at trial. Mr. Simeone testified that he was awakened at approximately 2:30 a.m. by what sounded to him like four or five voices yelling and threatening each other. He testified that the next sound that he heard was that of gunshots. According to Mr. Simeone, he dialed 9-1-1 and then looked out his bedroom window, at which time he saw a white or cream-colored car round the corner of Spruce Street and Acorn Street at a high rate of speed. Mr. Simeone testified that the car then abruptly stopped and a man jumped out of the passenger side yelling, "You want some more of this[?]" Mr. Simeone further testified that the man quickly got back into the car and was driven away.

### Analysis

### I

### Jury Instructions

The defendant argues that the trial justice erred when he instructed the jury that being armed with or having available a pistol or revolver without a license "shall be prima facie evidence" of an intention to

commit a crime of violence. It is defendant's contention that this instruction erroneously shifted the burden of proof from the prosecution to defendant by requiring defendant to prove that he did not have the intention to commit the crimes of violence with which he was charged. Although the state seems to acknowledge that the trial justice's initial instruction may have implied the presence of an impermissible mandatory presumption that defendant possessed the requisite intent to commit the crime, it nonetheless contends that later, in responding to a question posed by the jury during its deliberations, the trial justice gave a supplemental instruction defining prima facie evidence in language that rendered the presumption more permissive.[4]

In elaborating upon his contention concerning the "prima facie evidence" issue, defendant directs our particular attention to the following instruction contained in the trial justice's charge to the jury:

"In a trial of a person charged with committing or attempting to commit a crime of violence, the fact that a person was armed or had available a pistol or revolver without a license to carry it shall be prima facie evidence of intention to commit the crime of violence [sic] from the fact of the use of a deadly weapon, a reasonable inference may be drawn, directly and without speculation, that the Defendant formed an intent to kill the victim."

Notably, the trial justice thereafter proceeded to instruct the jury regarding the defense of self-defense. After the trial justice completed giving his instructions to the jury, which instructions were later submitted in written form to the jury, defense counsel objected to the above-quoted portion of the instructions, arguing that it created a presumption that defense counsel contended was no longer permitted under the law. The trial justice noted the objection, but allowed his instruction to stand, stating: "[W]ith regard to the presumption, I think that's well covered in my instructions. * * * I'm satisfied that the instruction as to prima facie evidence will stand also."

In the course of its deliberations later that day, the jury sent a note to the trial justice requesting a definition of the term "prima facie." The trial justice responded by sending in to the jury a note containing the following definition: "Prima facie evidence is evidence that may assist in establishing a fact." Defense counsel again objected, arguing that the original instruction and the supplemental definition of prima facie evidence created a burden-shifting presumption that defendant had possessed the intent to commit the crime of violence with which he was charged. Once more the trial justice rejected this argument, stating that he was "satisfied that the original instruction, along with the definition of 'prima facie evidence' [was] the correct one."

The next morning, after having researched the issue further, defense counsel enunciated his objection with greater specificity, arguing that, by giving the label "prima facie evidence" to defendant's admitted possession of an unlicensed firearm, the trial justice caused that particular evidence to have a "heightened persuasive force." He urged that the jury be instructed to give the evidence concerning

4. The state's concession about the "apparent mandatory nature of the presumption" actually refers to the statute upon which the trial justice appears to have based the disputed portion of the instructions. G.L. 1956 § 11-47-4. Nevertheless, the state candidly acknowledges that the trial justice's instruction to the jury with respect to this issue was "[p]artially based upon the language of the statute."

defendant's possession of an unlicensed firearm no greater status than any other evidence with respect to the intent to kill element of the crime with which defendant was charged.

In support of his contention that the jury would view the possession of an unlicensed firearm in a manner different from the manner in which it would view other evidence, defense counsel pointed to the fact that the jury had interrupted its deliberations in order to specifically request of the trial justice a definition of the term "prima facie." The trial justice acknowledged that the issue was a close one, telling defense counsel: "You may be right. * * * The only definition they didn't have was the definition of prima facie evidence, and you're right, maybe I should have said something." After hearing the prosecution's point of view on the matter, however, the trial justice again denied defendant's request for a clarifying instruction. On appeal, defendant reiterates the argument that he made at trial in support of his objection to the "prima facie evidence" portion of the trial justice's jury instructions.

■■■ As we have frequently noted, "[i]n reviewing the appropriateness of a trial justice's jury instructions, this Court examines the instructions as a whole in light of the meaning and interpretation that a jury composed of ordinary, intelligent lay persons would give them." *State v. Cotty*, 899 A.2d 482, 497 (R.I.2006) (internal quotation marks omitted); *see also State v. Hallenbeck*, 878 A.2d 992, 1007 (R.I.2005); *State v. Gomes*, 604 A.2d 1249, 1256 (R.I.1992); *see generally Cupp v. Naughten*, 414 U.S. 141, 146–47, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973). This Court does not limit its focus to a single phrase or sentence in jury instructions; rather, we consider the disputed phrase or sentence in the context of the instructions as a whole. *Cotty*, 899 A.2d at 497; *see also State v. Kittell*, 847 A.2d 845, 849 (R.I. 2004). If we are persuaded that the jury could have been misled by an erroneous charge to the resultant prejudice of the complaining party, reversal is warranted. *Cotty*, 899 A.2d at 497.

■■■ It is our opinion that there is merit in defendant's contention that, by describing the evidence of defendant's possession of an unlicensed firearm as "prima facie evidence" of intent to commit the crime of violence, the trial justice distinguished that evidence from other evidence in the case, and, in doing so, may well have caused the jury to reach an incorrect conclusion as to which party bore the burden of proof. *See generally State v. Amado*, 433 A.2d 233 (R.I.1981). The fact that the jury expressly requested a definition of that technical term indicates to us that "prima facie" evidence may well have been viewed by one or more of the jurors as being different from other types of evidence and as constituting a mandatory presumption. Even viewing the charge as a whole, *see Cupp*, 414 U.S. at 146–47, 94 S.Ct. 396, we are unable to shake our conviction that the "prima facie evidence" portion of said charge more likely than not was a significant distracter to the jury with respect to the burden of proof issue. Consequently, it is our opinion that the "prima facie evidence" instruction was erroneous.

■■■ We are aware that harmless-error analysis is permissible in this context. *See, e.g., State v. Golembewski*, 808 A.2d 622, 624 (R.I.2002) ("An improper instruction on a single element of an offense—an omission, misdescription, or conclusive presumption, for example—is subject to harmless-error analysis."); *see also Neder v. United States*, 527 U.S. 1, 9–10, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999); *Rose v. Clark*, 478 U.S. 570, 577, 106 S.Ct. 3101, 92

L.Ed.2d 460 (1986). In the instant case, however, we have reviewed the record with care, and we have concluded that the erroneous "prima facie evidence" instruction directly impacted defendant's plainly articulated defense of self-defense by allowing the jurors to infer that defendant intended to commit the crime of violence with which he was charged. Consequently, we cannot in good conscience hold that this particular instructional error was harmless beyond a reasonable doubt.[5]

Although we are vacating defendant's conviction due to the prejudice he suffered by virtue of the erroneous "prima facie evidence" jury instruction, we shall proceed to address those issues raised in defendant's appellate brief which might become bones of contention at a retrial of this case.

## II

### Evidence of the Victim's Criminal Record

■ In a section of his brief that is less than pellucid, defendant contends that the trial justice erred by precluding him from establishing the criminal record for violent behavior of the murder victim, Mr. Cruso. We note at the outset that our review of the record reveals that the trial justice did, in fact, permit the introduction of some evidence of Mr. Cruso's conviction for a drug-related offense. The clerk of the Superior Court was subpoenaed to trial by defendant and was permitted by the court to testify that Mr. Cruso had been convicted of the charge of delivery of a controlled

substance. In addition, defendant himself testified that he was afraid of Mr. Cruso due to the fact that, in defendant's eyes, he was a "dangerous kid" and was also a "drug dealer." It follows that further evidence of Mr. Cruso's conviction of a drug-related offense would have been cumulative.

■ Nevertheless, while passing over in silence the above-referenced testimony of the Superior Court clerk, defendant argues to us that he should have been permitted to introduce, through the cross-examination of Detective Robert Drohan, evidence of the decedent's conviction for delivery of a controlled substance—a crime which defendant asserts establishes dangerousness. The defendant argues that evidence of the decedent's conviction of such a crime would have been relevant to the jury's determination as to who was the aggressor in the violent encounter between Mr. Cruso and him. This argument is unpersuasive, since it is well settled that a defendant who asserts the defense of self-defense is not required to demonstrate that the victim was the initial aggressor. *State v. Dellay,* 687 A.2d 435, 438 (R.I. 1996). We reiterated quite recently the principle that, because "the defense of self-defense does not require a showing that the victim had a violent character, * * * evidence of the victim's character is appropriately limited to reputation or opinion testimony and * * * evidence of specific prior acts of violence by the victim are admissible only if the defendant had been

5. We are certainly not indicating that rational inferences have no place in criminal trials. While most mandatory presumptions are constitutionally suspect, *see Francis v. Franklin,* 471 U.S. 307, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985), *permissive inferences* are acceptable in criminal trials in appropriate circumstances provided that there is "a rational connection between the fact proven and the inference to be drawn." *State v. Lusi,* 625 A.2d 1350, 1356 (R.I.1993); *see also County Court of Ulster County v. Allen,* 442 U.S. 140, 156, 99 S.Ct. 2213, 60 L.Ed.2d 777 (1979) (Stevens, J.) ("Inferences and presumptions are a staple of our adversary system of factfinding."); *In re Vincent,* 122 R.I. 848, 413 A.2d 78 (1980); *State v. Neary,* 122 R.I. 506, 409 A.2d 551 (1979).

aware of them at the time of the encounter with the victim." *Cotty,* 899 A.2d at 492 (internal quotation marks omitted).

In addition, we note that the conviction which defendant sought to introduce in the instant case was not, in actuality, a conviction involving a violent crime. The defendant emphasizes on appeal that the offense of unlawful delivery of a controlled substance—the crime of which the victim was convicted in August of 1994—is treated in G.L. 1956 § 12–13–5.1 as presumptively involving "dangerousness." [6] Although it is true that § 12–13–5.1, which pertains to the denial of bail, creates a presumption that a person charged with unlawful delivery of a controlled substance is a "danger to the safety of the community," defendant apparently seeks to equate "dangerousness" with violence. We decline to accept defendant's characterization of the victim as having had a criminal record for violent behavior when that characterization is based on the victim's conviction of a crime that implicates a statutory presumption whereby, solely in the bail determination context, he is to be considered a danger to the community. We perceive nothing in the language of that statute reflective of a legislative mandate that, in other quite different contexts, dangerousness is to be equated with violence.

## III

### Procedure for Admitting Former Testimony

Finally, defendant argues on appeal that an improper procedure was employed in connection with the introduction of the testimony of witnesses whom the trial justice determined to be unavailable. After a careful review of the record, we can discern no abuse of discretion by the trial justice in this regard.

### Conclusion

For the reasons set forth in this opinion, the defendant's appeal is sustained, his conviction is vacated, and the case is remanded to the Superior Court for retrial. The record may be returned to that court.

---

6. General Laws 1956 § 12–13–5.1 reads as follows:

"Whenever a person is charged with, or indicted or informed against, for an offense involving the unlawful * * * delivery * * * of any controlled substance, or by possession of any controlled substance punishable by imprisonment for ten (10) years or more, and the state objects to the setting of bail pursuant to the R.I. Const., Art. I, Sec. IX, if the court determines that the proof of guilt is evident or the presumption great, then it shall be presumed that the person is a danger to the safety of the community unless that presumption is rebutted by the defendant."