**STATE**

v.

**Michael A. BALLARD.**

**No. 80–341–C.A.**

Supreme Court of Rhode Island.

Jan. 20, 1982.

Dennis J. Roberts II, Atty. Gen., Alfred French Goldstein, Sp. Asst. Atty. Gen., for plaintiff.

Barbara Hurst, Janice M. Weisfeld, Asst. Public Defenders, for defendant.

## OPINION

MURRAY, Justice.

On March 16, 1979, a Providence County grand jury returned this criminal indictment charging the defendant, Michael A. Ballard (Ballard)[1], with one count of conspiracy to kidnap with intent to extort,[2] two counts of kidnapping with intent to extort,[3] one count of kidnapping,[4] one count of committing a crime of violence when armed with a firearm,[5] one count of carrying a pistol without a license,[6] and three counts of assault with a dangerous weapon.[7] Following a lengthy jury trial in the Superior Court, the defendant was convicted on all counts.[8] He is before us now on an appeal from the judgments of conviction entered against him on those charges. We find no merit in the issues raised by the defendant in this appeal and affirm the convictions below.

The testimony and evidence presented at defendant's trial reveal the following pertinent facts. In the early morning hours of March 8, 1979, three teenagers, Francis T. Galleshaw III (Frank), his sister, Tammy E. Galleshaw (Tammy), and a next door neighbor, Kenneth Fullman (Kenneth), were abducted at gunpoint by a masked man from the garage next to the Galleshaw home located on Inman Road in Burrillville, Rhode Island. The abductor, later identified as Salvatore Savastano, Jr. (Savastano), handcuffed Frank and then forced the three teenagers to get into Frank's automobile. Savastano then drove Frank's vehicle out of the driveway, down Inman Road onto Route 102, and toward Route 7. Once on Route 7, Savastano told Kenneth to get out of the car and then threatened to kill him if he went to the police. Savastano drove the Galleshaw vehicle to a place where he soon met Ballard and Alan Gomel (Gomel), an isolated wooded area somewhere off Route 7 in North Smithfield. There the Galleshaws were taken from the vehicle, placed into the trunk of a 1974 Chevrolet Impala belonging to defendant, and driven by the trio for approximately one hour to Jamestown. On the island, Frank and Tammy were left in Savastano's custody in an abandoned ammunition bunker in the vicinity of Fort Getty, and defendant and Gomel departed.

Kenneth meanwhile had contacted Frank and Tammy's father, who got in touch with the police. The Rhode Island State Police and the local office of the FBI were also called into the investigation. Thus began a daylong, complicated series of events involving a large-scale aircraft and motor-vehicle surveillance operation which ultimately resulted in the capture and arrest of three suspects. Later, at trial, an FBI agent testified that during an interview at

1. Also charged as codefendants and as coconspirators with defendant in this indictment were Alan R. Gomel and Salvatore L. Savastano, Jr. At the time of defendant's trial, both Gomel and Savastano had pleaded guilty to the charges against them and were awaiting sentencing. Savastano appeared as a witness for the state against defendant.

2. In violation of G.L.1956 (1969 Reenactment) § 11–1–6, as enacted by P.L.1975, ch. 283, § 2.

3. In violation of G.L.1956 (1969 Reenactment) § 11–26–2.

4. In violation of G.L.1956 (1969 Reenactment) § 11–26–1.

5. In violation of G.L.1956 (1969 Reenactment) § 11–47–3, as amended by P.L.1977, ch. 16, § 1.

6. In violation of G.L.1956 (1969 Reenactment) § 11–47–8, as amended by P.L.1975, ch. 278, § 1.

7. In violation of G.L.1956 (1969 Reenactment) § 11–5–2.

8. Prior to the commencement of defendant's trial, the state moved to dismiss count V of the indictment charging Ballard with committing a crime of violence when armed with a firearm. The defendant, however, was tried and convicted on the remaining counts of the indictment.

State Police Headquarters, defendant allegedly told him that on the morning of the kidnapping he had had second thoughts about going through with the plan because he would be working against the FBI and the State Police—"people that knew what they were doing." Unfortunately for defendant, his assessment was quite accurate.

The defendant and Gomel eventually returned to Providence, and shortly thereafter a neighbor visiting in the Galleshaw home received a telephone call from a male caller, using a German accent, demanding a ransom of $500,000 for the safe return of the Galleshaw children. Later that morning Mr. Galleshaw received a call from the same person who again made the ransom demand and told Galleshaw that he would be calling him at around 5 p. m. that day with further instructions.

Meanwhile, at approximately 6 p. m., after almost ten hours in the bunker in Jamestown, Frank and Tammy persuaded Savastano that his accomplice had abandoned him and that he was being taken for his share of the ransom money. Savastano finally agreed to release the two and they made their way to a nearby house from which Tammy called her father. When the State Police arrived in Jamestown, the children gave them a description of Savastano. Shortly thereafter, Savastano was arrested at a road block that had been set up at the Newport Bridge. Once in custody, Savastano named Ballard and Gomel as his accomplices in the kidnapping scheme and gave the State Police a description of the vehicle he thought they would be driving.

At approximately 6:24 p. m., Lieutenant Donald F. Bodington (Bodington) of the Rhode Island State Police, pretending to be Mr. Galleshaw, received a phone call from a male using a German accent. The caller instructed Bodington to bring the ransom money to a telephone booth at the Howard Johnson's at Jefferson Boulevard in Warwick, where he would receive further instructions. Bodington and a surveillance team of some fifteen vehicles carrying both State Police detectives and FBI agents then proceeded on an itinerary composed of a series of phone booths beginning in Warwick and advancing, according to the caller's instructions, sequentially to other phone booths, finishing up finally at one located in Swansea, Massachusetts. While Bodington was proceeding to that phone booth, Anthony J. Mancuso (Mancuso), at that time a State Police lieutenant and a member of the surveillance team, spotted a male in a phone booth located approximately a mile away from the booth to which Bodington was proceeding. Mancuso observed a vehicle parked next to the phone booth bearing a registration-plate number that had been broadcast to members of the surveillance team as identifying a car belonging to one of the suspects. Mancuso traveled past the phone booth, turned his vehicle around and observed the suspect dialing the telephone. At that time Bodington was receiving final instructions from the caller about where the ransom money was to be dropped off and where Frank and Tammy were to be picked up.

Mancuso and the other members of the surveillance team moved in. One of the State Police officers yelled, "State Police," and defendant hung up the telephone and walked out of the booth. FBI Agent Robert Hargreaves asked defendant his name, and he replied, "Michael Ballard." The defendant was placed under arrest, advised of his *Miranda* rights, and transported to the Rhode Island State Police Headquarters in Scituate, Rhode Island. Gomel was arrested the following morning in Cumberland by the State Police. Bodington later testified at trial that while on the phone with the caller, he heard someone at the other end of the line yell, "State Police."

Prior to the commencement of his trial, defendant moved to suppress the testimony of Corporal John E. Turner of the Rhode Island State Police and that of FBI Special Agent W. Dennis Aiken concerning an oral statement allegedly given by defendant at State Police Headquarters following his ar-

rest in which statement he admitted participation in the kidnapping. The trial justice denied the suppression motion. At trial, one of the state's chief witnesses was Savastano who testified in great detail concerning defendant's involvement in the planning and the perpetration of the abduction of the three young people.

A Superior Court jury subsequently returned guilty verdicts on all counts against defendant. The trial justice later denied defendant's motion for a new trial and sentenced defendant to serve two life sentences plus sixty-five years, all of which were imposed to run consecutively.[9]

On appeal to this court, defendant sets forth eight grounds[10] grounds upon which he urges us to vacate the convictions below. The additional facts involved in this appeal will be discussed as necessary in the resolution of the issues raised by defendant.

## I

Initially, defendant contends that the trial justice erred in denying his motions for an individual voir dire of prospective jurors out of the presence of the other jurors. The defendant argues, as he did before the trial justice, that such a voir dire was necessary because of the "massive prejudicial pretrial publicity surrounding the case."

Ballard in his brief concedes that during the jury voir dire in this case the trial justice allowed him to question prospective jurors regarding whether they had been exposed to some type of publicity concerning the Galleshaw kidnapping. Ballard argues, however, that because other jurors were present, the trial justice and counsel could not—for fear of infecting the others—make inquiry into precisely what the prospective members of the jury panel knew about the case. This, he contends, prevented the trial justice from determining if the prospective jurors were truly impartial.

In this jurisdiction we have consistently adhered to the rule that the manner and the extent of examination of prospective jurors and their disqualification from service is a matter that lies within the sound discretion of the trial justice. *State v. Spivey*, 114 R.I. 43, 48, 328 A.2d 414, 417 (1974); *State v. Nault*, 112 R.I. 687, 692, 314 A.2d 627, 629 (1974); *State v. Palmigiano*, 111 R.I. 739, 743, 306 A.2d 830, 833 (1973); *State v. Pella*, 101 R.I. 62, 64, 220 A.2d 226, 229 (1966). We are satisfied that defendant suffered no substantial prejudice by the voir dire procedure employed by the trial justice in this case. The trial justice went to great lengths during voir dire to inquire of the prospective jurors whether or not they had formulated an impression or an opinion about the facts or about the parties in the case based upon anything they might have seen, read or heard in the media. Whenever any of the prospective jurors indicated that he or she had formed an opinion, the trial justice excused that individual without further questioning.

In our view, the trial justice allowed counsel wide latitude in questioning prospective jurors regarding whether they had formed an opinion or belief about the case or about the parties involved; and in fact,

---

**9.** Specifically, defendant received the following sentences: count I (conspiracy to kidnap with intent to extort)—ten years; count II (kidnapping Tammy E. Galleshaw with intent to extort)—life; count III (kidnapping Francis T. Galleshaw III with intent to extort)—life; count IV (kidnapping Kenneth Fullman)—twenty years; count VI (carrying a pistol without a license)—five years; count VII (assault with a dangerous weapon against Tammy E. Galleshaw)—ten years; count VIII (assault with a dangerous weapon against Francis T. Galleshaw III)—ten years; count IX (assault with a dangerous weapon against Kenneth Fullman)—ten years.

**10.** One issue raised by defendant in his brief filed in this matter was that the trial justice erred in denying his motion to suppress evidence obtained through warrantless searches of his automobile and of an automobile owned by Gomel. However, in a memorandum filed in response to the state's brief, defendant withdrew his claim of error from our consideration.

each prospective juror who eventually was seated on panel and who heard the case had been asked, and each had responded that he or she had not. In these circumstances, defendant has failed to demonstrate that the trial justice abused his discretion in denying his motion for an individual voir dire of prospective jurors out of the presence of the other jurors.

## II

■ The second issue raised by defendant in this appeal is that the trial justice erred in denying his motion, based upon our ruling in *State v. Jenison*, R.I., 405 A.2d 3 (1979), to quash the indictment against him on the ground that the grand jury that handed up the indictment against him was unconstitutionally composed. The defendant's argument is based upon the fact that the exemption from jury service afforded to college students and professors under G.L. 1956 (1969 Reenactment) § 9–9–3[11] resulted in a grand jury that violated the fair-cross-section requirement of the Sixth Amendment.

The record below indicates that, prior to trial, defendant moved to dismiss the indictment against him by attempting to demonstrate through the testimony of several witnesses that the procedure used by the jury commissioner in granting exemptions to college professors and students under § 9–9–3 resulted in the systematic exclusion of a cognizable class from jury service. At the hearing below, testimony was taken from Alfred Travers, Jr., the jury commissioner; and Allegra Munson, an assistant public defender. Miss Munson testified that she had examined, pursuant to an order entered by another Superior Court justice in another case, the records of petit and grand jury questionnaires in the jury commissioner's office and had compiled statistics from the

questionnaires from July 1, 1978, to July 1, 1979, the period of time from which the grand jurors who had returned the instant indictment had been drawn. Essentially, she testified that for the period in question, 270 persons that had been drawn by the computer from the voting lists of the various cities and towns were qualified for jury service. Out of that number, 15 fell within one of the categories of the exemptions list in § 9–9–3 and were therefore eligible for exemption from service. Miss Munson testified further that all 15 of those persons eligible for exemption chose to exercise their exemption and were not summoned to serve on a jury panel. On cross-examination, Miss Munson was not able to say, however, how many, if any, of the 15 persons excused from jury service by reason of their claimed exemption were college professors and/or students. The trial justice, in denying defendant's motion to dismiss, noted that from the statistics provided by Miss Munson it was impossible to determine exactly what class was allegedly being excluded. He ruled that on the basis of the evidence before him, there had been no showing that any cognizable class had been unconstitutionally excluded from jury service and for that reason denied defendant's motion.

The defendant in his brief claims that the trial justice erred in ruling that "the class of college professors and students were not legally cognizable." A careful examination of the transcript reveals, however, that the trial justice did not rule that such a class was *not* cognizable but only that the statistical evidence set forth by defendant was insufficient to show that *any* cognizable class of persons was being unconstitutionally excluded from jury service. Furthermore, the record does not, as alleged by defendant in his brief, contain evidence to demonstrate "a gross under-representation

11. At all times material to this appeal, G.L.1956 (1969 Reenactment) § 9–9–3 provided in part that "the president, professors, tutors, and students of recognized universities and colleges" were exempt from service as jurors. The Leg-

islature, however, recently amended § 9–9–3 with the enactment of P.L.1980, ch. 242, § 2, which, *inter alia*, removed the exemption given to members of the college academic community.

of the class [of members of the academic community] in jury pools."

In view of this deficiency in the statistical evidence presented by defendant at the hearing below, we cannot say that defendant provided the trial justice with a sufficient factual basis upon which he could rule that the granting of exemptions from jury service to members of the academic community violated the provisions of the Sixth Amendment. We cannot, therefore, fault the trial justice's denial of defendant's motion to dismiss the indictment against him.

## III

Ballard next contends that the trial justice erred in denying his motion to suppress his alleged confession to the State Police and the FBI agents because the confessions were fruits of a violation of the dictates of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The defendant's argument, as we understand it, is that the State Police and the FBI agents obtained probable cause for his arrest only after he, in response to Agent Hargreaves's question, identified himself as "Michael Ballard." Ballard contends that prior to that time all that Mancuso or Corporal Michael Urso (Urso), who was with Mancuso in the vehicle, had known was that Savastano had implicated Ballard by name in the kidnapping scheme. Neither officer knew Ballard and, as the testimony at the suppression hearing later revealed, neither could say with certainty that he had received a physical description of the suspect. The defendant now argues that the question posed to him by the FBI agent was designed to elicit an incriminating response. Under the peculiar circumstances of this case, Ballard continues, the answer furnished by him was incriminating and was deliberately elicited

at a time when he was in custody. The failure of the police to give the non-familiar litany of *Miranda* warnings [12] requires the suppression of all the evidence derived from the exploitation of the arrest. The defendant claims that the trial justice erred in refusing to do so.

■ We note here that we cannot subscribe to the view taken by defendant that the probable cause for his arrest was obtained through an exploitation of a violation of *Miranda*. Upon reviewing the transcript of the hearing on defendant's motion to suppress, we are of the opinion that there was adequate probable cause for the State Police and the FBI agents to arrest defendant prior to and aside from the agent's request and defendant's identification of himself as Michael Ballard.

In ruling on defendant's motion to suppress, the trial justice stated:

"[I]t is obvious that Officer Mancuso and Agent Hargreaves had at the time of the arrest of the defendant Ballard, not only the information furnished by Mr. Savastano, but also all of the other information concerning the events of the day and the results of the investigation. Savastano's information alone was sufficient. He was an actual participant. There couldn't have been any closer bird's eye information than that given by Savastano, and so that is the information that was possessed by the arresting officers when they made the arrest. Based on the information that they had, it was obvious, and it is obvious to the court, that they were totally justified in concluding that the person who identified himself as Ballard, and who was arrested eight feet away from the vehicle that had been described as being one of the vehicles in which Ballard could be, justified

12. In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court enunciated that a defendant

"must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in

a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Id.* at 479, 86 S.Ct. at 1630, 16 L.Ed.2d at 726.

the arresting officers in concluding that the subject that they arrested was in fact the person who had committed the crime of kidnapping, along with Savastano. And, for that reason, this court finds, without any question whatsoever, that there was more than ample probable cause in existence at the time of the arrest of the defendant Ballard in Swansea * * *."

In determining whether the State Police and the FBI agents had sufficient probable cause to arrest defendant, we must be guided by the definition set forth by the United States Supreme Court in *Beck v. Ohio*, 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964), that probable cause to arrest depends upon

> "whether, at the moment the arrest was made * * * the facts and circumstances within [the arresting officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense." *Id.* at 91, 85 S.Ct. at 225, 13 L.Ed.2d at 145.

*See also State v. Belcourt*, R.I., 425 A.2d 1224, 1226 (1981); *State v. Firth*, R.I., 418 A.2d 827, 829 (1980).

Applying this standard to the facts of the instant case, we find that after Savastano had been arrested and was being transported to the Wickford barracks of the State Police, he gave the State Police the names of his two accomplices, Michael Ballard and Alan Gomel, and a description of Ballard's automobile. This information was transmitted to Lieutenant Charles T. Cunningham (Cunningham) of the State Police at the base headquarters located in the Galleshaw home. With Cunningham at the time was Aldo Merlino, a friend of the Galleshaw family. Merlino informed Cunningham that he knew both Ballard and Gomel, and he gave Cunningham a physical description of each. With this information, the State Police and the FBI agents were able to ascertain that the registration plate for Gomel's vehicle was Rhode Island AG–107. Cunningham testified that at approximately 8:25 p. m. all this information was transmitted to an agent in an FBI helicopter and was then relayed over an FBI radio frequency by that agent to all members of the surveillance team.

Mancuso testified that he and Urso were traveling in an unmarked State Police vehicle as part of the surveillance team. He testified that at approximately 8:45 p. m. he received a communication from base headquarters which included the names of the two suspects, descriptions of two vehicles that they might have been using, and possibly a description of the two suspects. One of the vehicles was described as a 1972 Audi with Rhode Island registration AG–107. Shortly after receiving this information, Mancuso stated that he was advised by an FBI agent that Bodington had received instructions from the caller to proceed to a telephone booth at the junction of Routes 6 and 118 in nearby Swansea, Massachusetts. Mancuso testified that he and Urso traveled some distance past that phone booth to take up a surveillance position. While enroute they observed a Volkswagen Scirocco with Rhode Island registration AG–107 parked approximately eight feet from a phone booth on Route 6. Mancuso and Urso also observed a male in the booth operating the telephone.

Relying upon this evidence, we conclude that at the time Mancuso and Urso observed Ballard in the phone booth on Route 6, they possessed sufficient facts to provide them with probable cause to believe that the male in the phone booth was the person who had been making the telephone calls to Bodington and was, in fact, in the process of making a call to him at that time. We are therefore of the opinion that there was sufficient probable cause for defendant's arrest prior to his identification of himself as Michael Ballard.

■ We also believe that Agent Hargreaves's question, "What is your name?" directed to defendant while in custody was

not a question "reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). Rather, we view the agent's question to defendant as merely a reasonable means of obtaining personal data or achieving the identification of a suspect taken into custody, and therefore, there was no requirement that defendant be advised of his constitutional rights pursuant to *Miranda*.

■ Even assuming, arguendo, that no probable cause existed for defendant's arrest at the time Mancuso and Urso observed defendant in the telephone booth on Route 6, we feel that the police officers were justified in approaching defendant in order to determine his identity. In *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), the United States Supreme Court noted that in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.E.2d 889 (1968), the Court recognized that even in instances in which there is no probable cause to make an arrest, a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possible criminal behavior.

> "A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time." *Adams v. Williams*, 407 U.S. at 146, 92 S.Ct. at 1923, 32 L.Ed.2d at 617. *See also State v. Belcourt*, R.I., 425 A.2d at 1227.

We conclude, however, that under the facts and circumstances of this case there was probable cause for defendant's arrest prior to the agent's request that defendant identify himself and, as a result, that such a request did not violate defendant's rights under *Miranda*. Accordingly, we find no error in the trial justice's denial of defendant's motion to suppress the statements allegedly made by him.

IV

The next claim of error asserted by defendant is that the trial justice invaded the province of the jury by instructing it, by implication, that a statement had in fact been made by defendant to the State Police and the FBI agents, an allegation that defendant disputed. Thus, defendant argues, the trial justice took away from the jury an important factual question in violation of provisions of the United States and Rhode Island Constitutions. In support of this contention, defendant directs us to several portions of the transcript wherein the trial justice referred to the statement made by defendant but did not at any time recognize that defendant in his testimony before the jury denied ever having made a statement.

■ This court has long held that in passing on the validity or correctness of the trial justice's instructions to the jury, we are obligated to examine and consider the charge given as a whole and must not pick out certain phrases or sentences out of context. *State v. Page*, 104 R.I. 323, 334, 244 A.2d 258, 264 (1968); *State v. Mantia*, 101 R.I. 367, 376, 223 A.2d 843, 848 (1966).

■ In considering the charge given by the trial justice in this case as a whole, we are satisfied that any harm caused by the trial justice's failure to mention that defendant denied having made a statement was cured by a warning given by the trial justice during that portion of his charge in which he discussed defendant's statement:

> "I might caution you whenever I refer to what the evidence might have shown, if your recollection differs from what I say to you, it is your recollection that governs, not mine. You are the judges of the facts."

Hence, there is no merit in this issue raised by defendant.

V

The defendant was charged with and convicted of assault with a dangerous weap-

on[13] against Tammy Galleshaw, Frank Galleshaw, and Kenneth Fullman. He was also charged with and convicted of kidnapping the two Galleshaw teenagers with intent to extort[14] and of kidnapping[15] the Fullman boy. Ballard now contends that his conviction on more than one crime against each of the three youngsters violated his right to be free from double jeopardy, in support of which contention he advances two arguments. First, defendant contends that the charges of assault with a dangerous weapon against the three young people merged with or were incidental to the kidnapping of the three, and that his conviction on both the kidnapping (and kidnapping-with-intent-to-extort) and the assault-with-a-dangerous-weapon charges in regard to each of the three youngsters violated the constitutional prohibition against double jeopardy.

It is fundamental that a defendant has a constitutional right to be free from the risk of being placed in "double jeopardy." A defendant's right to be free from a second prosecution following an acquittal or conviction is afforded by both the Fifth Amendment to the United States Constitution and art. I, sec. 7 of our state's constitution. *See State v. Boudreau*, 113 R.I. 497, 502, 322 A.2d 626, 629 (1974); *State v. Trivisonno*, 112 R.I. 1, 2, 307 A.2d 539, 539 (1973).

■ As we first noted in *State ex rel. Scott v. Berberian*, 109 R.I. 309, 284 A.2d 590 (1971), the standard used in this jurisdiction for determining whether an accused is in danger of being twice placed in jeopardy for the same offense is that set forth by the United States Supreme Court in *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), wherein the Supreme Court held that

"the applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Id.* at 304, 52 S.Ct. at 182, 76 L.Ed. at 309.

We have consistently followed this "required" or "same evidence" test to determine whether two or more charges against a defendant arising out of the same incident violates his or her right to be free from double jeopardy. *State v. Robalewski*, R.I., 418 A.2d 817, 826 (1980); *State v. Anil*, R.I., 417 A.2d 1367, 1374 (1980); *State v. Pope*, R.I., 414 A.2d 781, 787–88 (1980); *State v. Davis*, R.I., 384 A.2d 1061, 1064 (1978); *State v. Grullon*, 117 R.I. 682, 685–86, 371 A.2d 265, 267–68 (1977).

In *State v. Davis*, R.I., 384 A.2d at 1064, we further explained how the *Blockburger* test is to be applied:

"The test centers on the elements of the two crimes with the goal of ascertaining whether each crime charged, notwithstanding a possible factual overlap, requires proof of an element that the other

**13.** General Laws 1956 (1969 Reenactment) § 11–5–2 provides:

"Every person who shall make an assault or battery, or both, with a dangerous weapon, or with acid or other dangerous substance, shall be punished by imprisonment for not more than ten (10) years."

**14.** General Laws 1956 (1969 Reenactment) § 11–26–2 provides:

"*Kidnapping with intent to extort.*—Whoever commits any of the offenses mentioned in this chapter with intent to extort money or other valuable thing[s] shall be guilty of a felony, and upon conviction thereof shall be punished by imprisonment for life or for any term not less than five (5) years."

**15.** General Laws 1956 (1969 Reenactment) § 11–26–1 provides:

"*Penalty for kidnapping.*—Whoever, without lawful authority, forceably or secretly confines or imprisons another person within this state against his will, or forceably carries or sends another person out of this state, or forceably seizes or confines or inveigles or kidnaps another person with intent either to cause him to be secretly confined or imprisoned within this state against his will or to cause him to be sent out of this state against his will, shall be guilty of a felony and upon conviction thereof shall be punished by imprisonment for not more than twenty (20) years."

does not *Iannelli v. United States*, 420 U.S. 770, 785 n.17, 95 S.Ct. 1284, 1293–94 n. 17, 43 L.Ed.2d 616, 627 n.17 (1975). Thus, if each crime requires proof of an additional fact, neither an acquittal nor a conviction of one crime immunizes an accused from prosecution and punishment for the other. If, however, the same evidence suffices to establish both crimes, a defendant may not be prosecuted a second time nor be twice punished."

■ Applying this standard to the two offenses charged under the facts of this case, we find that the same evidence necessary to convict defendant on the kidnapping charges or on the kidnapping-with-intent-to-extort charges would be insufficient to convict defendant on the charges of assault with a dangerous weapon. Each of the crimes charged here required proof of an additional fact not required to prove the other. In order for the state to have proven defendant guilty of kidnapping, it was necessary that the state introduce evidence to show that defendant unlawfully confined or imprisoned another person against his or her will and also to show some asportation of that person—elements not necessary to convict defendant of assault with a dangerous weapon. Moreover, the state in proving the charge of kidnapping with intent to extort had to show the additional element of specific intent to extort. Likewise, for the state to have proved defendant guilty of assault with a dangerous weapon it was necessary for the state to show that an assault did in fact take place and that the instrumentality used by defendant was either a dangerous weapon per se or that an object was used in such a way that it had the capability of producing serious bodily harm.

It does not follow, as defendant argues in his brief, that the state, by proving the elements of the crime of kidnapping, had automatically proven the crime of assault with a dangerous weapon and that no further proof was required. Thus, the offenses do not merge under the double-jeopardy

clause. We conclude that defendant was properly charged with kidnapping, kidnapping with intent to extort, and assault with a dangerous weapon. Accordingly, defendant's convictions on counts I, II, III, IV, VII, VIII, and IX of the indictment must stand.

The other aspect of defendant's argument is that under this court's recent interpretation of our kidnapping statute. G.L.1956 (1969 Reenactment) § 11–26–1, in *State v. Innis*, R.I., 433 A.2d 646 (1981), he was entitled to a judgment of acquittal on count IX of the indictment (charging kidnapping of Kenneth Fullman) because the evidence introduced at trial showed that the asportation of Kenneth was merely incidental to the assault with a dangerous weapon against him.

In *State v. Innis*, we analyzed in great detail the historical development of our kidnapping statute (§ 11–26–1) and the case law of other jurisdictions. We concluded in *Innis* that conduct traditionally considered to be an integral element of another crime cannot be punished as kidnapping under our statute. We specifically endorsed the view expressed by the New York Court of Appeals in *People v. Levy*, 15 N.Y.2d 159, 204 N.E.2d 842, 256 N.Y.S.2d 793 (1965), that the kidnapping statute should only be applied to "conventional" kidnappings. We noted that to apply the wording of the statute in a literal manner would sometimes result in kidnapping convictions based upon trivial changes in location having no bearing on the evil at hand. We therefore held that

"[c]onfinements that are incidental to the commission of a crime are not punishable under § 11–26–1. In order to come within the scope of that section, a confinement or imprisonment must have some independent significance. Thus, any movement of a victim during the course of a crime cannot be punished as a kidnapping unless the movement exceeds that necessary to facilitate the crime at hand." *State v. Innis*, R.I., 433 A.2d at 655.

Viewing the facts of this case in light of this standard, we feel that the confinement of the Fullman boy in the Galleshaw vehicle and the asportation of Fullman in that vehicle clearly had significance independent of the crime of assault with a dangerous weapon against him. We cannot seriously consider the argument that the Fullman kidnapping was committed only to facilitate the crime of assault with a dangerous weapon. The confinement and asportation of Fullman was not incidental to the commission of the crime of assault with a dangerous weapon and, therefore, punishable as kidnapping under § 11–26–1. Hence, defendant was not entitled to a judgment of acquittal on the count of the indictment charging him with the kidnapping of Fullman. Further, in view of our determination that the same evidence is not sufficient to establish both the crimes of assault with a dangerous weapon and kidnapping, we need not address ourselves to defendant's equally fallacious argument that the charge against defendant of kidnapping Fullman merged with the crime of assaulting him with a dangerous weapon.

## VI

We now turn to defendant's three remaining contentions relating to alleged errors committed by the trial justice in his instructions to the jury. The defendant claims first that the trial justice erred in instructing the jury on the definition of the term "proof beyond a reasonable doubt." In his charge, the trial justice instructed the jury, in part, that

> "reasonable doubt is beyond a doubt based on the evidence or the lack of evidence before you, not a mere fanciful doubt, or possible doubt. A doubt, in order to be a reasonable doubt, must be actual or a substantial doubt which remains in your minds after you have fairly, impartially, thoroughly evaluated the evidence which has been brought before you."

The defendant ascribes error to the fact that the trial justice defined "reasonable doubt" as an "actual or a substantial doubt." In support of this claim of error, defendant relies upon our recent opinion in *State v. Thorpe*, R.I., 429 A.2d 785 (1981), in which we held in a footnote that thereafter "trial justices, in discussing the reasonable-doubt doctrine, shall omit any reference to 'substantial doubt.'" *Id.*, 429 A.2d at 790 n.4. The defendant argues here that the effect of the trial justice's definition of "reasonable doubt" as "substantial doubt" was to lessen unconstitutionally the state's burden of proof.

The defendant in so arguing, however, overlooks the fact that our opinion in *Thorpe* was filed on May 8, 1981, whereas the trial in the instant case took place over the course of several days in September and October 1979. Thus, at the time the trial justice instructed the jury he did not have the benefit of our critical comment concerning the definition of "reasonable doubt" as a "substantial doubt" and our exhortation to trial justices about the use of the term "substantial doubt" in defining proof beyond a reasonable doubt. We cannot fault the trial justice for instructing the jury on the law as it existed at that time. *See State v. Murphy*, 113 R.I. 565, 573–74, 323 A.2d 561, 565 (1974); *State v. Mantia*, 101 R.I. 367, 375, 223 A.2d 843, 848 (1966). In our view the trial justice correctly and fairly defined the law pertinent to the definition of burden of proof beyond a reasonable doubt, and we therefore reject defendant's claim of error in this regard.

## VII

The defendant next argues that the trial justice erred in failing to define the term "intent to extort" in instructing the jury on the charges of conspiracy to kidnap with intent to extort and kidnapping with intent to extort. Ballard argues that the trial justice committed plain error when he failed to instruct the jury on every element of the offenses charged and that therefore his conviction on these charges must be vacated.

Our examination of the record indicates that the trial justice during his charge instructed the jury on the elements of the crimes of conspiracy to kidnap with intent to extort and kidnapping with intent to extort. For instance, at one point during his charge, the trial justice, after reading the pertinent language of the kidnapping-with-intent-to-extort statute (§ 11–26–2), stated:

"Now, that is the pertinent language of the statute regarding kidnapping with intent to extort. The gravamen, that is, the heart of that charge, that crime, is the unlawful, forcible seizure, confinement or kidnapping of a person within this state against his or her will and with an intent on the part of the person doing the seizing, confining or kidnapping to extort money or other valuables for the continued well-being or the release or return of the seized, confined or kidnapped person. In order to prove the charges made against this defendant in Counts 2 and 3 of this indictment, it is necessary that the state prove to you by evidence beyond a reasonable doubt that this defendant did intentionally and unlawfully, forcibly seize or confine Tammy Galleshaw and Francis T. Galleshaw III with intent to extort money."

Following the completion of his charge, the trial justice allowed counsel the opportunity to state for the record their objections to the charge as given. Although defense counsel voiced other complaints with the charge, he expressed no dissatisfaction with the trial justice's charge on the grounds he now alleges.

 We are unable to reach the merits of defendant's contention because of our long-held rule that we shall consider on appeal only those issues that have been raised in the court below. As we have stated many times before, Rule 30 of the Superior Court Rules of Criminal Procedure [16] specifically bars a party from assigning as error any portion of a charge or any omission therefrom unless he specifically directs the trial justice's attention to the matter to which he objects. Thus, the failure of defendant to object to the trial justice's charge on the grounds he now alleges precludes him from challenging the sufficiency or the correctness of that charge on appeal. *State v. Vargas*, R.I., 420 A.2d 809, 815–16 (1980); *State v. Giordano*, R.I., 413 A.2d 93, 94 (1980).

The defendant in his brief cites *State v. Robalewski*, R.I., 418 A.2d 817 (1980), for the proposition that the failure of the trial justice to instruct a jury on every element of an offense constitutes plain error. Recently, in *State v. Williams*, R.I., 432 A.2d 667 (1981), in responding to the identical argument, we stated:

"We note that Rhode Island had not theretofore recognized the plain-error rule. Indeed, in promulgating rules of criminal procedure, Rule 52(b) of the Federal Rules of Criminal Procedure, which deals with plain error, was specifically deleted to conform to Rhode Island case law. *See* Super.R.Crim.P. 52, Reporter's Notes. *See also State v. Quattrocchi*, 103 R.I. 115, 124, 235 A.2d 99, 104 (1967). Thus, errors not asserted in the trial court will only be considered under extraordinary circumstances wherein a defendant has 'suffered an abridgment of his basic constitutional rights.' *State v. Frazier*, 103 R.I. 199, 201, 235 A.2d 886, 887 (1967), *cert. denied*, 390 U.S. 1033, 88 S.Ct. 1430, 20 L.Ed.2d 292 (1968). Even courts in those jurisdictions wherein Rule 52(b) is in force have frequently asserted that it should not be applied in such a way as to destroy Rule 30. *E.g., United States v. Graydon*, 429 F.2d 120, 123–24

---

16. Rule 30 of the Superior Court Rules of Criminal Procedure in pertinent part provides:

"No party may assign as error any portion of the charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection. Objections shall be made out of the presence of the jury."

(4th Cir. 1970); *United States v. Ostendorff*, 371 F.2d 729, 731 (4th Cir.), *cert. denied*, 386 U.S. 982, 87 S.Ct. 1286, 18 L.Ed.2d 229 (1967)." *Id.*, 432 A.2d at 670.

We conclude, as we did in *Williams*, that the circumstances of the instant case do not warrant the application of the extraordinary remedy of ignoring the requirements of Super.R.Crim.P. 30.

## VIII

As his final grounds for reversal of his conviction, defendant argues that the trial justice erred in instructing the jury on count VI of the indictment charging him with carrying a pistol without a license. Specifically, defendant faults that portion of the charge where the trial justice instructed the jury:

"That gets us to Count 5 in the indictment. Count 5 in the indictment charges that * * * Michael Andrew Ballard, on or about the 8th day of March 1979 at Burrillville in the County of Providence, did without a license, carry a pistol, to wit, a .38 caliber pistol, on or about [his] person in violation of 11–47–8 of the General Laws of Rhode Island, 1956 as amended. In pertinent part the statute, the law 11–47–8 that pertains to carrying a pistol without a license reads as follows: No person shall, without a license issued [therefor], carry a pistol in any vehicle or on or about his person, whether visible or concealed, except in his dwelling house or except in his place of business, or except on * * * land possessed by him. The law further provides that certain people such as sheriffs, policemen, and other law enforcement officers, are exempt from the licensing requirements. *Any person charged however with carrying a pistol without a license may show any facts that would render his possession or use of such a firearm to be lawful. In short, the defendant, if he claims to be exempt from the licensing requirements of the statute, may present any evidence that he wishes to indicate that he is within the class of exempted persons.*" (Emphasis added.)

The defendant argues that the trial justice in effect instructed the jury that a lack of license may be presumed from the fact of carrying a pistol. This defendant contends, relieves the state of its burden of proving the lack of a license as an element of the crime and, further, unconstitutionally shifts the burden to defendant to prove an element of the offense charged. We disagree.

In *State v. Neary*, R.I., 409 A.2d 551 (1979), the defendants, charged with carrying a pistol without a license, claimed that since absence of a license constitutes an essential element of the crime, the statutory mandate found in G.L.1956 (1969 Reenactment) § 11–47–27 [17] may not constitutionally satisfy the state's burden of proving that they had no license. In *Neary* we noted, however, the distinction between the evidentiary concepts of the burden of production and the ultimate burden of proof and stated that although an accused never bears the burden of satisfying the factfinder of his innocence and the state always bears the burden of proving the guilt of an accused beyond a reasonable doubt in a criminal prosecution, the burden of going forward with the evidence may shift from side to side during the course of a proceeding. The burden of production of evidence may therefore properly rest with a defendant once the state has developed a prima facie case and has introduced evidence suf-

---

**17.** General Laws 1956 (1969 Reenactment) § 11–47–27 reads as follows:

"*Proof of unlawfulness of carrying.*—No negative allegation of any kind need be averred or proved in any complaint under §§ 11–47–1 to 11–47–34, inclusive, and the carrying or use of any firearm contrary to the provisions of said sections shall be evidence that the possession, carrying or use of any such firearm is unlawful, but the respondent in any such case may show any fact that would render the possession, or use, or carrying of such firearm lawful."

ficient to justify a defendant's being required to challenge the proof with an excuse or explanation. We further held in *Neary* that § 11–47–27 creates a statutory authorization that the carrying or the use of a firearm contrary to the provisions of §§ 11–47–1 to 11–47–34, inclusive, shall be evidence of the unlawfulness of such carrying or use, thus easing the burden placed upon the state and, further, eliminating the requirement that the state advance affirmative evidence to support a negative averment (lack of a license). When the state has introduced evidence sufficient to warrant a finding of possession, it then becomes incumbent upon the defendant to raise the issue of the fact of his possession of a license.

"Under our statute prohibiting the carrying of a pistol without a license, the latter phrase is a descriptive negative which constitutes an essential element of the offense. The statutory inference formulated in § 11–47–27, which places the burden upon a defendant to introduce evidence of circumstances that would render his possession lawful, does no more than require the defendant to raise the issue of justification by evidence peculiarly within his own control and based upon knowledge immediately within his personal reach. Such legislation which provides that proof of one fact shall be evi-

dence of an ultimate fact in issue is merely the enactment of a rule of evidence and in no way violates one's right to due process of law." *State v. Neary*, R.I., 409 A.2d at 555.

We find no error in the trial justice's charge. In our view the trial justice correctly instructed the jury on the essential elements of the crime of possession of a weapon without a license and about the statutory inferences found in § 11–47–27. We cannot say that the trial justice, in so instructing, unconstitutionally shifted the burden to the defendant to prove an essential element of the crime charged.

For the reasons set forth, the defendant's appeal is denied and dismissed. The judgments of conviction appealed from are affirmed, and the papers in this case are remanded to the Superior Court.