**STATE**

v.

**Rafael COTTY.**

No. 2002–691–C.A.

Supreme Court of Rhode Island.

June 12, 2006.

Jane M. McSoley, Esq., Providence, for Plaintiff.

Janice M. Weisfeld, Esq., Providence, for Defendant.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

### Introduction

Justice ROBINSON for the Court.

On March 19, 2001, the defendant, Rafael Cotty, was charged by indictment with murdering Bettie Ann Senerchia in violation of G.L.1956 § 11–23–1. After a hearing on pretrial motions, a jury trial commenced on May 8, 2002, at the conclusion of which the jury found the defendant guilty of second-degree murder. A motion for a judgment of acquittal, on which the trial justice had earlier reserved ruling, was heard and denied on June 7, 2002. The defendant's motion for a new trial was denied on June 20, 2002; and, on September 13, 2002, the trial justice sentenced the defendant to life imprisonment. A timely notice of appeal was filed on the defendant's behalf.

On appeal, defendant contends that the trial justice committed four specific errors (relating to certain evidentiary rulings and to the jury instructions), which purported errors had the effect of (a) preventing him from being able to fully present evidence in support of his theory of self-defense and (b) preventing the jury from considering the self-defense theory in the light of proper jury instructions.

With respect to the alleged evidentiary errors, defendant specifically argues (1) that his defense of self-defense warranted the admission of evidence of certain prior violent acts committed by the victim; and (2) that his defense of self-defense warranted the admission of evidence of the victim's reputation for becoming intoxicated and combative.

With respect to the trial justice's alleged errors in charging the jury, defendant argues (1) that the trial justice's refusal to instruct the jury as to the relevance of the record evidence of the victim's combative and aggressive character constituted clear error; and (2) that the trial justice erroneously shifted the burden of proving self-defense to defendant.

For the reasons set forth herein, we affirm the judgment of conviction.

### Facts and Travel

In September of 2000, Bettie Ann Senerchia and her husband, Vincenzo, lived in the first-floor apartment of a three-story building located at 48 Francis Avenue in Cranston, Rhode Island. The Senerchias' daughter, Crystal, was engaged to defen-

dant and was living with him in the third-floor apartment of the same building. The second-floor apartment was occupied by Maria and Abel Clemente and their two sons.

Mr. and Mrs. Senerchia had developed a close relationship with defendant over the three-and-a-half-year period during which he had been living with Crystal. In fact, defendant considered Crystal's parents to be his parents, referring to them as "Mom" and "Dad." Crystal Senerchia testified at trial that defendant was especially close to her mother, whom he loved, and with whom he got along well, except for certain occasions when Mrs. Senerchia would argue with Crystal.

Although Crystal testified that she had a "very good relationship" with her mother, she acknowledged that Mrs. Senerchia was an alcoholic and that she became "verbally mean" when she was drinking. In addition, Crystal testified that other people who knew her mother were aware that she drank and knew that it was best to avoid her when she became intoxicated because she had a tendency to pick fights on those occasions.

Mr. Senerchia testified that his marriage to Mrs. Senerchia was not without friction; and he acknowledged, albeit more reluctantly than did his daughter, that Bettie's drinking habits were sometimes the subject of arguments between them.[1] Mr. Senerchia further testified that he gam-bled regularly and that his penchant for gambling was another source of inter-spousal tension. Crystal and Mr. Senerchia both testified that Bettie was under a doctor's care for some "mental health issues" including depression and anxiety, and Mr. Senerchia stated that Mrs. Senerchia drank a little more than usual when she was depressed.

On September 12, 2000, Mrs. Senerchia's stepfather passed away, after which she began drinking more to help deal with her depression. During that period, an incident occurred during which Mrs. Senerchia entered the bedroom where Mr. Senerchia was lying down watching television, and she showed him a newly-purchased knife by holding it up above her head. Although Mr. Senerchia testified that Mrs. Senerchia did not threaten him with the knife, Crystal testified that she removed all of the knives from her parents' apartment following this incident. Moreover, Mr. Senerchia and Crystal became so concerned about Mrs. Senerchia's drinking after her stepfather's death that, on September 17, 2000, they sent her to the detoxification unit of Roger Williams Hospital, where she stayed until September 19 or 20, 2000.[2]

On Wednesday, September 27, 2000, Mr. Senerchia went to Lincoln Downs, a racetrack in Lincoln, Rhode Island, where he stayed until closing time. He testified that he had been "losing some good money" and that he left that gambling establish-

---

1. Although Mr. Senerchia manifested palpable reluctance about providing testimony concerning Mrs. Senerchia's drinking habits, he did concede on cross-examination that he had filed a complaint for a protective order in Rhode Island Family Court in February of 1999, in which he had asserted that Mrs. Senerchia was an alcoholic who stayed out all night drinking and used loud and profane language when she drank. Mr. Senerchia further testified that he had filed the complaint only to "scare" Mrs. Senerchia into

cutting down on her drinking, which he had felt was dangerous for her, and that he withdrew the complaint "almost the same day."

2. Mr. Senerchia testified that Mrs. Senerchia had wanted to be admitted into the detoxification unit and that no one in the family had to force her to go there. Crystal Senerchia testified to the contrary, however, stating that her mother protested and was taken there by rescue workers and the police.

ment. He further testified that, when he called Mrs. Senerchia, she told him not to come home and hung up. Mr. Senerchia then proceeded to drive to Foxwoods Casino in Ledyard, Connecticut, where he stayed until Thursday evening.

Mr. Senerchia spent the night of Thursday, September 28, at the third-floor apartment shared by Crystal and defendant, because he wanted to avoid an argument with Mrs. Senerchia about his gambling losses. The next morning, undeterred by those losses, Mr. Senerchia decided to return to Lincoln Downs to "try and make [his] money back." He testified that he returned home between 7:30 and 8 p.m. on Friday, September 29. Once again anxious to avoid an argument with his wife, he went back to the third-floor apartment. He further testified that Crystal was out doing errands, but that defendant let him into the apartment.

Crystal testified that, when she and defendant returned home from working at their jobs as flaggers at a construction site that Friday evening, she spoke on the telephone with her mother, who said that she felt ill. Crystal said that, after the telephone conversation with her mother, she left the house to do some errands, while defendant stayed at home. Crystal further testified that she returned home at around 9 p.m., by which time her father had returned from the racetrack and was at her apartment. Approximately thirty minutes later, Mrs. Senerchia went halfway up the stairs towards the third-floor apartment; she was carrying a plate of food, and she called out to Crystal to come and get the food and bring it to Mr. Senerchia, along with a message that she loved him. Crystal testified that she could tell her mother had been drinking because she appeared "mellow."

At some point between 9:30 and 10 p.m., Mr. Senerchia asked defendant to go downstairs to his apartment and look in his bedroom for some stool samples that he needed to give to his doctor. Mr. Senerchia testified that defendant came back upstairs when he could not locate the samples, but that, after being given further instructions as to where to look, he went back downstairs in another attempt to locate the samples. While defendant was downstairs the second time, Crystal telephoned her mother to find out what was taking defendant so long; she stated that her mother still sounded mellow and calm at that point. When defendant returned to the third-floor apartment, he had retrieved two of the three stool samples.

Crystal testified that she and defendant then had an argument because she had wanted him to eat dinner with her since it was getting late and they had to work the following morning, but defendant chose to take a shower instead. She testified further that she became increasingly upset because defendant stayed in the shower for forty-five minutes. The argument finally escalated to the point where Crystal told defendant that it was "over" between them, and she packed a few necessities and went out to her car with the stated intention of spending the night at her cousin's house. While the argument was taking place, Mr. Senerchia was in the spare bedroom, sleeping.

Instead of driving to her cousin's house, Crystal decided to park her car in a parking lot about 100 feet from her building. She did so because she felt that she would calm down there and would eventually go back into her apartment so that she and defendant could go to work together the following morning. After she had "cried [her] eyes out" for about fifteen minutes, Crystal then fell asleep in the car. She

testified that she neither heard nor saw anything unusual while she was in the car.

Crystal was awakened by defendant banging on her car window in an "erratic, crazy, nervous" manner while yelling that her mother was dead. Crystal testified that she then jumped out of the car and ran to her parents' apartment and into her father's bedroom to use the phone. Upon finding that phone unplugged, however, she ran upstairs to her own apartment to call 911. Crystal testified that, when she was in her parents' apartment, she caught a glimpse of her mother sprawled out on the floor. The defendant followed closely behind Crystal as she went into the house. When she asked him what had happened, he responded by saying, "I went to your mother's aid." On the way back downstairs after calling 911, Crystal saw her second-floor neighbors, Abel Clemente and his two sons, who opened their door and asked her what was going on. Crystal testified that she told them that her mother was dead.

Mr. Senerchia testified that, at some point in time after he had fallen asleep in Crystal's spare bedroom, he was awakened by the sound of loud banging coming up the stairs. He then arose from the bed and saw defendant and asked him what was going on. The defendant responded: "Mom, Momma's dead. Momma's dead." Mr. Senerchia testified that defendant was wearing a black leather jacket, which he had not been wearing earlier when he had gone downstairs to retrieve the stool samples.

Mr. Senerchia then followed defendant downstairs and went into his wife's bedroom, where he saw her sprawled out on her back on the floor, with blood "all over the place." Mrs. Senerchia was wearing only a nightgown which left her exposed below the waist. Mr. Senerchia testified that he picked up a jacket, which was lying by his wife's side, and covered her with it. He said that he then proceeded to try to wake her up by tapping her face. When his efforts to arouse his wife were unsuccessful, Mr. Senerchia ran to his bedroom to try to call the police. However, when he saw his phone lying upside down and unplugged on the bed, he ran out to the hallway and yelled upstairs to Manuel and Abel Clemente to call the police.

While Mr. Senerchia was in his wife's bedroom trying to arouse her, he heard defendant, who was in the living room, saying, "[w]hy, why, why" and banging on the frames in the hallway door, which broke. Mr. Senerchia testified that Crystal came into the apartment at that point, and he asked her to restrain defendant, who was "breaking everything." Crystal complied by walking defendant over to the couch. When the police arrived, they asked everyone to remain in the living room, where defendant, still hysterical, lay on the couch with his head buried in a pillow and cried, "[w]hy did, why did?" According to Mr. Senerchia's testimony, defendant kept banging the pillow saying, "[w]hy, why, why" over and over again. Mr. Senerchia testified further that defendant also slapped himself in the face about three times, after which he said, "[w]hy I did, why I did." The defendant fell off the couch onto the coffee table, strewing some knickknacks onto the floor.

Cranston Police Officer Jeffrey Saucier testified that, at approximately 1:26 a.m. on September 30, 2000, he responded to a 911 dispatch directing him to 48 Francis Avenue. Officer Saucier was met at the front door by Mr. Senerchia, who appeared to be very upset, and who repeatedly stated, "Come with me, it's my wife." Officer Saucier testified that he could hear people screaming for help as he entered the house and, upon entering the living room, he saw two people who he later determined were

Crystal Senerchia and defendant. Officer Saucier testified that Crystal and defendant were crouched on the floor and that Crystal had her arms around defendant.

When he reached the bedroom, Officer Saucier observed Bettie Ann Senerchia lying on the floor in a large pool of blood. Officer Saucier testified that there was a pair of dentures lying next to Mrs. Senerchia's head and that she had bruises on her legs and several cuts across her fingers and on the palms of her hands. Mrs. Senerchia also had a very large laceration across her throat. Officer Saucier was unable to feel her pulse. He observed that the bedroom was in a state of disarray: the bed linen, which was soaked in blood, had been removed from the bed and thrown in a pile; there was blood spattered on the walls; and a lamp as well as a telephone and a radio had been knocked over.

While Officer Saucier was surveying the scene in the bedroom, Officer Joseph Hopkins arrived at the apartment, having responded to a call for assistance. Sergeant McGrath, a patrol supervisor, had also arrived and instructed Officer Hopkins to remain at the front door while he and Officer Saucier examined the other rooms in the apartment. The officers then escorted Mr. Senerchia, Crystal and defendant into the living room in order to gather some information. Officer Saucier testified that defendant at first ignored the request to go into the living room and tried to force his way past Officer Saucier so he could go into the bedroom instead. The defendant was screaming and making strange, incomprehensible sounds at that time, and Officer Saucier found it necessary to physically escort him into the living room.

Officer Saucier and Officer Hopkins both testified that defendant's demeanor fluctuated between relaxed and hysterical.

The defendant continued to make strange animal-like noises and then began slapping himself in the face, eventually collapsing onto a coffee table. Neither officer was able to see defendant's face with any degree of clarity while they were in the living room, because he either kept it directed downward or covered it with his hands when they tried to speak to him. At approximately 2 a.m., Mr. Senerchia, Crystal, and defendant were transported to the Cranston Police Station, where they were placed in separate interview rooms.

Officer Jeffrey Chapman, who transported defendant to the police station, testified that, when he placed defendant in the interview room, defendant was visibly upset and was mumbling at an unusual rate. Officer Chapman further testified that defendant would not make eye contact with him. He noticed that defendant had his right hand withdrawn into the sleeve of his jacket and that, when he was asked why his hand was in that position, defendant responded that he was holding his glasses. When defendant then placed the glasses on a table in the interview room, Officer Chapman could see that they were spotted with "brown, reddish spots" that appeared to him to be blood. Officer Chapman then took the glasses from the room.

Detective William Moretti thereafter entered the interview room and explained to defendant that he was there to try and find out what had happened to Mrs. Senerchia. The defendant's demeanor at that point was calmer than it had been at the scene of the crime, and he was speaking in a lower voice. Detective Moretti testified that he asked defendant whether he would like to make a statement, and defendant indicated that he was very willing to cooperate, stating: "I want to find out who did this. I loved that woman." Detective

Moretti then read defendant his *Miranda* rights.[3]

The defendant then gave a "clear and concise" account of the events of September 29, and his account was largely consistent with Crystal's version of the events of that day. However, defendant became markedly less sure of himself when he began discussing what had happened after he and Crystal began arguing in the evening hours of that day. According to defendant's statement, after Crystal left the apartment, he heard Mrs. Senerchia arguing with someone downstairs. The defendant further stated that he had gone downstairs to make sure that she was not arguing with Crystal. He told the police that, when he saw Mrs. Senerchia on the floor of her bedroom in a pool of blood, he knelt beside her and shook her, pleading with her to wake up, before he ran screaming for help.

The police officers noticed that defendant had scratches on his neck and bruising around his eyes and on his nose; and, when they questioned him about those injuries, he appeared nervous and responded that he must have sustained them when he fell on the coffee table in the living room or when Crystal tried to pick him up after that fall. The defendant removed his leather jacket when asked to do so, revealing more scratching on his lower neck and chest. He then began sobbing, telling the police that he "loved Bettie and [he] didn't mean for this to happen." When Det. Moretti told defendant that he believed defendant was responsible for murdering Mrs. Senerchia, defendant responded that he had had to defend himself.

The defendant then gave a tape-recorded statement to the police, in which he stated that he and Mrs. Senerchia had had an argument that night after he told her that he felt she should share with her family the secret that he claimed she had shared with him—namely, that she had been raped by Abel Clemente. The defendant stated that Mrs. Senerchia then attacked him and was choking him and that, even though he did not want to hurt Mrs. Senerchia, he took a box cutter from his pocket and cut her with it in order to get her off of him. According to defendant's statement, he then ran upstairs and changed out of his bloody clothing, which he believed he threw in a dumpster, and then flung the box cutter away and started screaming about what had happened.

When he took the stand at his trial (in May of 2002), defendant maintained his story that he had acted in self-defense. He testified that, when he and Crystal arrived home from work on September 29, it was obvious to them that Mrs. Senerchia had been drinking.[4] He testified that, a short time later, as he was taking out the trash, he heard Mrs. Senerchia screaming from her kitchen window, "I hate you, I hate you" to Abel Clemente, who was raking or sweeping in the yard (an assertion which Mr. Clemente denied in his trial testimony). The defendant testified that, when he told her not to yell at their neighbor, Mrs. Senerchia told him that Abel Clemente had raped her. The defendant further testified that he reluctantly promised Mrs. Senerchia that he would not repeat that story to anyone.

The defendant testified that later in the evening he heard Mrs. Senerchia yelling

---

3. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

4. Crystal Senerchia similarly testified at trial that her mother had been drinking shortly

before she died. Moreover, assistant medical examiner Dorota Latuszynski testified that postmortem testing of the decedent's blood revealed an alcohol level of 0.137.

and believed that she was probably arguing with Crystal, who had left their apartment at that time after having argued with defendant. He further testified that he decided to leave to buy cigarettes and to check in on Mrs. Senerchia on his way out of the house. According to defendant, he entered Mrs. Senerchia's apartment at her invitation and found her in her bedroom. The defendant asked Mrs. Senerchia whether Crystal was there, explaining to her that they had had an argument, and Mrs. Senerchia told him that Crystal was not there.

It was the defendant's testimony that Mrs. Senerchia then accused him of having revealed to Crystal her secret concerning Abel Clemente, which Mrs. Senerchia believed to have been the cause of the argument between Crystal and defendant. The defendant further testified that Mrs. Senerchia then told him to come into her bedroom, where they continued to argue. According to defendant, he was unable to leave the bedroom due to the fact that Mrs. Senerchia, who was considerably larger than he,[5] pushed him aside as he walked towards the door and said, "You ain't going nowhere." The defendant testified that he then told Mrs. Senerchia to "stop playing around" and that what she was doing was not funny; he added that she became increasingly upset, while continuing to accuse him of betraying her confidence.

According to the testimony of defendant, he then attempted to grab the telephone to call Crystal for help, but Mrs. Senerchia pushed him, causing the telephone to drop to the floor. He further testified that Mrs. Senerchia continued to push and punch him until he fell onto the bed on his back, at which point he claimed that she jumped

on top of him and proceeded to choke him. The defendant stated that he grabbed Mrs. Senerchia's hands to try to release her grip on him, but that she continued to increase the pressure on his neck saying, "[Y]ou ain't going to tell nobody." The defendant testified that when he could no longer breathe, he reached into his pocket, pulled out his box cutter, and "swung." The defendant further testified that, when Mrs. Senerchia's grip on his neck became even tighter, he swung again and then heard a "boom boom" sound and finally felt himself able to breathe again.

The defendant testified that he then looked around for Mrs. Senerchia and threw a pillow in her direction in fear that she would come after him again. When Mrs. Senerchia did not react, defendant first searched for his glasses, which had come off during the struggle; he then went into the bathroom, where he vomited and then washed up. Although defendant knew that he had injured Mrs. Senerchia with the box cutter, he nevertheless went upstairs to the apartment that he shared with Crystal.

Once in the apartment, defendant testified, he saw his reflection in a mirror and observed that he was covered in blood and had some scratches on his neck. He then washed himself off again and put on a clean shirt and his black leather jacket. According to defendant, he then took the box-cutter blade, wrapped it in the bloody shirt that he had taken off, and placed both the box-cutter blade and the shirt underneath the box spring of his bed. The defendant initially told the police that he had hidden the bloody shirt and the box-cutter blade in a dumpster behind the house. Only after he was confronted by Officer Saucier following an unsuccessful

---

5. According to the testimony of the assistant medical examiner, Bettie Ann Senerchia was five feet five inches tall and weighed 218 pounds at the time of her death. The defendant's booking report listed his weight at 130 pounds.

search of that dumpster did defendant finally reveal the actual location of those items. Despite his claim that he acted in self-defense, defendant attempted to explain to the jury that his actions following Mrs. Senerchia's death, including hiding evidence and lying to the police about its whereabouts, were motivated by fear.

The defendant's version of the events of September 29 was not consistent with the forensic evidence that was introduced at trial. Assistant medical examiner Dorata Latuszynski testified that, along with multiple abrasions and contusions, Mrs. Senerchia sustained a total of nine incised wounds,[6] including what appeared to be a defensive wound.

After both parties had rested, the trial justice instructed the jury; and, at the request of defendant, the trial justice included an instruction pertaining to the defense of self-defense. The jury found defendant guilty of second-degree murder on May 31, 2002. A motion for a judgment of acquittal, on which the trial justice had earlier reserved ruling, was heard and denied on June 7, 2002. The defendant's motion for a new trial was heard and denied on June 20, 2002. On September 13, 2002, defendant was sentenced to a term of life imprisonment.

## Analysis

### I

### Evidentiary Issues

### A

### Specific Instances of Conduct

The defendant's first argument on appeal is that the trial justice erred in excluding evidence of specific incidents in which Mrs. Senerchia had exhibited aggressive or violent behavior over the course of the eight years before her death.[7] The defendant had proffered that evidence in support of his affirmative defense that he had acted in self-defense. Specifically, defendant had sought to introduce thirty-seven police reports created between January of 1992 and July of 2000, which reports documented the numerous instances when the Cranston Police were called to Mrs. Senerchia's home to investigate disturbances involving her. The defendant contends that these reports would have demonstrated Mrs. Senerchia's tendency to become combative or aggressive when intoxicated.

The defendant urges us to reverse our holding in *State v. Dellay*, 687 A.2d 435, 438–39 (R.I.1996), in which we held that prior specific violent acts of a victim, of which a defendant was unaware at the time of his or her encounter with the victim, are inadmissible under Rules 404(a)(2) and 405(b) of the Rhode Island Rules of Evidence. In support of his position that our holding in that case should be reversed, defendant contends that our later decision in *State v. Ventre*, 811 A.2d 1178 (R.I.2002), should be read as constituting a departure from the holding in *Dellay*. We disagree with this contention, and we now expressly indicate our continued adherence to our holding in *Dellay*.

In *Dellay*, 687 A.2d at 438, the defendant, who was appealing a second-degree murder conviction, argued that certain prior specific violent acts of the victim should have been admitted to support his defense of self-defense, even though the defendant was unaware of those acts at the time of

---

**6.** Doctor Latuszynski defined an "incised wound" as "a type of sharp force injury."

**7.** It is important to note that defendant was permitted to introduce evidence of certain prior acts of the victim of which he was aware at the time of the encounter with the victim.

the encounter with the victim.[8] The defendant in that case contended that the violent character of a victim was an essential element of the defense of self-defense and that, therefore, Rules 404(a)(2) and 405(b) should have been read together in such a way as to permit the introduction of prior violent acts irrespective of whether or not the defendant was aware of them at the time of the alleged criminal act.[9]

In rejecting this argument, we held that the existence of a violent character on the part of the victim is not an essential element of the defense of self-defense in this jurisdiction. *Dellay*, 687 A.2d at 438. In so holding, this Court relied upon the well-settled principle of Rhode Island law that a defendant who asserts the defense of self-defense is not required to demonstrate that the victim was the initial aggressor. *Id.* Because we held that the defense of self-defense does not require a showing that the victim had a violent character, we stated that evidence of the victim's character "is appropriately limited to reputation or opinion testimony" and that evidence of specific prior acts of violence by the victim

are admissible only if the defendant had been aware of them at the time of the encounter with the victim. *Id.* at 438, 439.

The defendant contends that our decision in *Ventre*, 811 A.2d at 1182, indicates a departure from our earlier holding in *Dellay*. We disagree with this contention. It is true that in *Ventre* we held that a trial justice's exclusion of evidence of the prior violent acts of the victim constituted reversible error. It is highly significant, however, that the defendant in that case had asserted that he was aware of those acts at the time of his encounter with the victim. In holding that such evidence should have been admitted, we emphasized that "[k]nowing that one of his assailants not only was frequently involved in violent altercations, but had also committed the act of murder, would unquestionably contribute to the reasonableness of defendant's fear." *Ventre*, 811 A.2d at 1182.

We are convinced that our holdings in *Dellay* and *Ventre*, which are factually distinguishable, are not materially at odds with each other. We have in no way retreated from our position that, in self-

---

**8.** It has long been the law in Rhode Island that evidence of a victim's prior specific acts of violence of which a defendant *was aware* at the time of the encounter with the victim may be admitted in self-defense cases to demonstrate the reasonableness of the defendant's fear that the victim was about to inflict harm upon him or her. *State v. Tribble*, 428 A.2d 1079, 1085 (R.I.1981). By contrast, however, such evidence is not admissible for the purpose of establishing that the victim likely acted in conformity with those prior specific acts on the occasion in question. *Id.*

**9.** Rule 404(a)(2) of the Rhode Island Rules of Evidence carves out an exception to the general rule prohibiting the admission of evidence of a person's character. The exception states that the general rule shall not apply: "[i]n cases in which the defendant has raised self-defense * * *." In such cases the following is admissible:

"evidence of a pertinent trait of character of the victim of the crime offered by an

accused, or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the victim offered by the prosecution to rebut evidence that the victim was the first aggressor."

Rule 405 of the Rhode Island Rules of Evidence provides:

"(a) *Reputation or Opinion.* In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion. On cross-examination, inquiry is allowable into relevant specific instances of conduct.

"(b) *Specific Instances of Conduct.* In cases in which character or a trait [of] character of a person is an essential element of a charge, claim, or defense, or when evidence is offered under Rule 404(b), proof may also be made of specific instances of the person's conduct."

defense cases, evidence of prior specific acts of violence by the victim of which a defendant was *unaware* is inadmissible, whereas evidence of such acts of which a defendant was *aware* is admissible to show the reasonableness of defendant's fear.

Our more recent decisions in *State v. Hallenbeck*, 878 A.2d 992 (R.I.2005), and *State v. Garcia*, 883 A.2d 1131 (R.I.2005), further demonstrate the baselessness of defendant's contention that this Court has changed its position with respect to the admissibility of evidence of prior acts of violence committed by a victim. Those decisions quite clearly indicate that this Court has deliberately continued to adhere to the holding in *Dellay*.

When, in *Hallenbeck*, the defendant requested that this Court reconsider its position concerning the admission of a victim's prior violent acts irrespective of defendant's knowledge of same at the time of the fatal altercation, we reiterated the well-established rule that "admission of [a victim's] entire criminal record is, truly, an effort to disparage the victim's general character and is not probative of the defendant's apprehensive state of mind." *Hallenbeck*, 878 A.2d at 1015 (quoting *State v. Tribble*, 428 A.2d 1079, 1086 n. 11 (R.I.1981)).

We reiterated our adherence to the principles enunciated in *Dellay* even more emphatically in *Garcia*, 883 A.2d at 1136. In that case, when faced with a similar argument raised by the defendant, we quite bluntly stated that "[u]nder no set of circumstances will evidence of specific acts of conduct be admissible to prove that a vic-

tim acted in conformity on a particular occasion or to establish that the victim was the aggressor." *Id.* In reaching our holding that the trial justice had properly excluded the proffered evidence in *Garcia*, we stated that "[e]vidence of previous specific acts of the victim is admissible only if the defendant was aware of the conduct at the time of the confrontation." *Id.* In that case, we characterized the requirement that a defendant show that he or she had prior knowledge of a victim's prior acts as being a "strict condition precedent" for the admission of such evidence. *Id.*

■ The defendant in the present case has presented no compelling reason for us to deviate from our earlier decisions with respect to this issue. Consequently, we decline to repudiate our holding in *Dellay*. Indeed, we take this occasion to quote with approval (as we did in *Dellay* ) the following language from this Court's opinion in *State v. Tribble*, 428 A.2d 1079 (R.I.1981):

> "[A] defendant who asserts the defense of self-defense is * * * entitled to adduce relevant evidence of specific acts of violence perpetrated by the victim against third parties, *provided however*, that the defendant was aware of these acts at the time of his encounter with the victim." *Id.* at 1085 (emphasis added).[10]

The defendant argues in the alternative that the specific prior acts of violence committed by Mrs. Senerchia and referenced in the thirty-seven police reports which he sought to introduce should have been admitted, pursuant to Rule 406 of the Rhode Island Rules of Evidence,[11] as evidence of

---

10. The *Tribble* case was decided prior to the effective date of our Rules of Evidence, but its holding with respect to the issue at bar is consistent with and was cited as authority in support of the holding in *Dellay*.

11. Rule 406 of the Rhode Island Rules of Evidence states:
   "Evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or

a habit on the part of Mrs. Senerchia of becoming drunk and verbally and physically aggressive. This argument is without merit.

■ This Court will not overturn a trial justice's ruling on an evidentiary matter "unless that ruling constitutes an abuse of the justice's discretion that prejudices the complaining party." *Dellay*, 687 A.2d at 439 (internal quotation marks omitted). In the instant case, defendant attempted to introduce at trial thirty-seven police reports documenting encounters between Mrs. Senerchia and the police in an effort to demonstrate that she had exhibited a continuing course of conduct of becoming drunk and verbally and physically aggressive. However, at trial, defense counsel could cite only five instances involving physical violence on the part of Mrs. Senerchia. Nevertheless, defendant maintains on appeal that the reports still "point[ed] to the combative nature of Mrs. Senerchia enough to show that she [had] a pattern of being combative."

■ In rejecting defendant's contention, the trial justice expressly made reference to the Advisory Committee Notes to Rule 406 of the Federal Rules of Evidence (the text of which rule is identical to Rule 406 of the Rhode Island Rules of Evidence), wherein habit is defined as being "one's regular response to a repeated specific situation." The trial justice concluded that "five incidents out of thirty-seven that the defendant has cited hardly rise to the level of semiautomatic conduct when Mrs. Senerchia was intoxicated." We agree with the trial justice that, although the police reports may have demonstrated that Mrs. Senerchia became intoxicated on several occasions, they do not demonstrate that

she had a habit of becoming violent when drunk. Consequently, we hold that the police reports were properly excluded.

## B

### Reputation Evidence

■ The defendant's next contention on appeal is that the trial justice's exclusion of certain evidence of the victim's reputation for becoming intoxicated and combative constituted clear error and that the error was not harmless. Specifically, defendant argues that Mrs. Senerchia's husband, Vincenzo, her sister, Monica Santiago, and Det. Albert Corrente should have been permitted to testify about Mrs. Senerchia's reputation for becoming drunk and combative. Although it is true that defendants who assert the affirmative defense of self-defense may introduce evidence of the victim's reputation for violent behavior, it is our opinion that the trial justice's exclusion of the testimony of these particular witnesses concerning the victim's reputation was not an abuse of discretion.

■ It is well settled that a defendant who contends that he or she acted in self-defense is entitled to present evidence that the victim had a reputation for being violent in order to show that the defendant's fear of injury was reasonable or to show that the victim was the aggressor. *See, e.g., Ventre*, 811 A.2d at 1182 ("Our cases have held that when self-defense is asserted, a defendant has a right to present * * * reputation evidence * * *."); *State v. Soto*, 477 A.2d 945, 949 (R.I.1984) ("Evidence probative of the victim's reputation for violence is highly relevant and admissible to show, among other things, that the victim was the aggressor in a case in which self-defense is raised."); *State v. Infantoli-*

organization on a particular occasion was in conformity with the habit or routine

practice."

no, 116 R.I. 303, 313, 355 A.2d 722, 728 (1976) ("When a defendant has pleaded self-defense, [the defendant] may introduce evidence of [the] adversary's reputation for violent behavior in order to show either the reasonableness of the defendant's fear at being injured or the fact that the adversary was the aggressor.").

It is equally true, however, that the exclusion of some evidence to that effect does not constitute an abuse of the trial justice's discretion when the excluded evidence is cumulative.[12] *See State v. Cote,* 691 A.2d 537, 541 n. 4 (R.I.1997) ("Relevant reputation testimony may also be excluded if the trial justice finds * * * that 'its probative value is substantially outweighed by the danger of * * * needless presentation of cumulative evidence.' ") (quoting R.I. R. Evid. 403); *see also State v. Angell,* 122 R.I. 160, 168, 405 A.2d 10, 15 (1979); *cf. State v. Lynch,* 854 A.2d 1022, 1032 (R.I.2004) ("It is well established that the admission of hearsay evidence is not prejudicial when the evidence is merely cumulative * * *.") (internal quotation marks omitted).

In the instant case, although the trial justice would not permit the above-referenced witnesses to testify regarding Mrs. Senerchia's reputation for becoming intoxicated and combative, it is our opinion that defendant nevertheless had the opportunity to present sufficient evidence of that reputation through the testimony of other witnesses. Specifically, Mrs. Senerchia's daughter, Crystal, testified on cross-examination that their neighbors "didn't like that [her mother] drank." She testified further that the neighbors were of the opinion that, when Mrs. Senerchia became intoxicated, they should leave her alone because she would pick fights. Mrs. Senerchia's sister similarly testified that, in her opinion, Mrs. Senerchia became "very violent" at times when she was under the influence of alcohol and that she would scream and "flip out." Finally, defendant himself was permitted to testify that Mrs. Senerchia drank frequently and that she became "loud" and "mad about any little thing" on the occasions when she was drinking.[13]

Because the evidence that the trial justice excluded was cumulative and bearing in mind that Rule 403 specifically authorizes the exclusion of cumulative evidence, it is our judgment that defendant's case was not materially prejudiced by the exclusion of the proposed additional testimony concerning the victim's reputation for violence. Accordingly, although we do not depart from the rule that evidence of a victim's reputation for violence is generally admissible when a defendant asserts a defense of self-defense, the exclusion of the cumulative evidence as to that issue in the present case was not an abuse of the trial justice's discretion.

---

**12.** Cumulative evidence has been defined as evidence "tending to prove the same point to which other evidence has been offered." *State v. Lynch,* 854 A.2d 1022, 1032 (R.I.2004) (quoting *State v. Coleman,* 239 Neb. 800, 478 N.W.2d 349, 358 (1992)).

**13.** The closing argument of defense counsel does not appear to us to be entirely reconcilable with defendant's argument on appeal that he was prejudiced by the exclusion of reputation testimony in this case. When presenting his closing argument with respect to defendant's claim that he acted in self-defense, defense counsel relied upon Mrs. Senerchia's reputation in the community for becoming combative when intoxicated, stating:

"Now, consider Bettie Senerchia * * *. We know that she did not have a good reputation in regards—amongst her neighbors. Her own daughter told you that when she was under the influence of alcohol, she was somebody that you would stay away from. The reputation among the neighborhood was when Bettie Senerchia was drunk, don't go near her because she's always going to pick fights with you."

## II
## Jury Instructions
### A
### Refusal to Instruct on Relevance of Character Evidence

■ The defendant's next contention on appeal is that the trial justice erred in refusing to instruct the jury on the relevance of evidence of the victim's combative character. In support of this argument, the defendant contends that there was sufficient evidence admitted at trial to warrant such an instruction (and he adds that there would have been a greater quantity of such evidence had the trial justice not made what defendant considers to have been the erroneous evidentiary rulings that we addressed in section I of this opinion). Before we reach the merits of defendant's contention with respect to the jury instruction, however, we must first determine whether the issue was properly preserved for appellate review.

Rule 30 of the Superior Court Rules of Criminal Procedure requires a party who wishes to interpose an objection to "any portion of the charge or omission therefrom" to state distinctly the matter to which the party objects and the grounds for that objection before the jury begins its deliberation. As we have repeatedly stated, Rule 30 bars a party from challenging an erroneous instruction unless the party, "after directing the trial court's attention to the asserted error or omission, [articulates] with reasonable clarity the precise grounds for [the] objection." *State v. Brown*, 744 A.2d 831, 837 (R.I.2000) (internal quotation marks omitted); *see also State v. Gardiner*, 895 A.2d 703, 717 (R.I.2006); *State v. Hanes*, 783 A.2d 920, 924 (R.I.2001).

■ The purpose of the specificity requirement is to alert the trial justice to the nature of the alleged error. *See Brown*,

744 A.2d at 837. We repeat here what we said quite recently in *State v. Crow*, 871 A.2d 930, 935 (R.I.2005):

> "The requirement in Rule 30 that the objection to an instruction be made before the jury retires (and that it be made with clarity and specificity) is crucial because, once alerted to the perceived error in the instruction that has been given, the trial justice has an opportunity to cure the alleged deficiencies before the jury retires for deliberations."

Absent a sufficiently specific objection, the trial justice cannot be expected "to be endowed with that quantum of total recall which would enable him or her at the conclusion of the charge to be certain that all necessary points have been covered accurately and completely." *State v. DeCiantis*, 501 A.2d 365, 368 (R.I.1985) (quoting *State v. Williams*, 432 A.2d 667, 670 (R.I.1981)).

In the instant case, at the close of the evidence, defense counsel filed written requests for jury instructions. Request Nos. 27, 28, 29 and 30 all pertained to self-defense; specifically, they concerned the victim's character for violence. Request No. 30, which is the instruction that defendant now contends was erroneously omitted by the trial justice, reads as follows:

> "The Defendant has introduced evidence of the decedent's character. More specifically the Defendant has introduced opinion evidence and reputation evidence about a character trait for violence. You should consider character evidence together with and in the same manner as all the other evidence. Character evidence alone may create a reasonable doubt of the Defendant's guilt."

During his initial charge to the jury, the trial justice gave a general instruction as to when a defendant is entitled to invoke

the doctrine of self-defense. At the end of the initial charge, defense counsel objected to the trial justice's failure to have given his requested instruction Nos. 27, 28, 29 and 30. The trial justice then agreed to instruct the jurors that they could consider those prior specific violent acts committed by Mrs. Senerchia of which defendant was aware at the time of the encounter with her; however, he was unwilling to give the instruction set forth in request No. 30. He stated that he was "not satisfied that there has been sufficient evidence that has been introduced that establishes that Bettie Senerchia had a character trait for violence."

After proceeding to give further instructions to the jury, the trial justice asked counsel for defendant whether he had any other objections; and defense counsel responded: "No, Judge, it's fine." This response could reasonably be understood to mean (1) that defense counsel was satisfied that the instructions given by the trial justice after defendant's objection had cured any perceived error contained therein or (2) that defense counsel, for tactical reasons, had opted not to pursue the matter further. If, at the end of the trial justice's supplemental charge to the jury, defendant still felt that the substance of the content of request No. 30 had been omitted improperly, defendant should have distinctly stated his objection and the grounds for same on the record at that time. Because no such objection was raised, defendant has not properly preserved the issue for appellate review.

## B

### Alleged Burden Shifting

The defendant's final argument on appeal is that the trial justice's instructions with respect to his defense of self-defense were erroneous and improperly shifted to defendant the burden of proving that he was entitled to invoke the defense.

■ In reviewing the appropriateness of a trial justice's jury instructions, this Court examines the instructions " 'as a whole in light of the meaning and interpretation that a jury composed of ordinary, intelligent lay persons would give them.' " *Lieberman v. Bliss–Doris Realty Associates, L.P.*, 819 A.2d 666, 672 (R.I. 2003) (quoting *Hodges v. Brannon*, 707 A.2d 1225, 1228 (R.I.1998)); *see also State v. John*, 881 A.2d 920, 929 (R.I.2005); *State v. Gomes*, 604 A.2d 1249, 1256 (R.I. 1992) ("When reviewing the instructions of a trial justice, we must examine the instructions in their entirety in order to determine the manner in which a jury of ordinarily intelligent lay persons would have understood the instructions as a whole.").

It is well settled that this Court will not focus on one phrase or sentence in the instructions without taking into account the context of that phrase or sentence and evaluating the instructions as a whole. *See State v. Kittell*, 847 A.2d 845, 849 (R.I.2004). We have also held that "[a]n erroneous charge warrants reversal only if it can be shown that the jury could have been misled to the resultant prejudice of the complaining party." *Hodges*, 707 A.2d at 1228 (internal quotation marks omitted).

The defendant's contention about burden shifting in the instant appeal is strikingly similar to the argument that the defendant unsuccessfully raised in *Kittell*, 847 A.2d at 849. The defendant in that case took issue with the trial justice's having included in his jury instructions the phrase: "*[Y]ou determine from the facts that the defendant was entitled to invoke the doctrine of self-defense.*" *Id.* at 849 n.

2.[14] The defendant contended that a reasonable juror could have inferred from such an instruction the notion that the defendant had to bear the burden of providing proof that he had acted in self-defense. *Id.* We rejected that argument, relying on the standard of review for jury instructions, which requires this Court to review disputed language in a particular jury instruction in the context of the entire charge. *Id.* at 850; *see also Hanes,* 783 A.2d at 925 ("On review, 'we will not examine single sentences. Rather, the challenged portions must be examined in the context in which they were rendered.' ") (quoting *State v. Marini,* 638 A.2d 507, 517 (R.I.1994)).

■ The phrase with which defendant takes issue in the instant case is nearly identical to the disputed phrase in *Kittell.* In the case at bar, the trial justice included in his instructions the following phrase: "[W]here * * * you have determined from the facts that [defendant] was entitled to invoke the doctrine of self-defense." The defendant argues, as did the defendant in *Kittell,* that, by including this phrase, the trial justice "may well have caused the jury to think that it had to find that [defendant] was not the aggressor before any burden shifted to the state—rather than requiring the state to prove beyond a reasonable doubt that he was * * * the aggressor."

Our review of the trial justice's charge to the jury in its entirety reveals that the instruction concerning the allocation of the burden of proof was clear and cogent. Specifically, he stated:

"As I explained to you at the beginning of this trial, Mr. Cotty is presumed innocent, even as the Court instructs you at this time. The burden of proof rests with the State of Rhode Island at all times during the trial and during your deliberations. It never shifts to Mr. Cotty. That burden of proof is to prove each and every element of the charge contained in the Indictment to each of you beyond a reasonable doubt. * * * The presumption of innocence remains with Mr. Cotty throughout the trial. *The law does not require Mr. Cotty to prove his innocence or to produce any evidence.* The burden of proving Mr. Cotty's guilt beyond a reasonable doubt rests on the State of Rhode Island and *that burden of proof never shifts* during the course of the trial." (Emphases added.)

Moreover, the trial justice's initial self-defense instruction was also a clear articulation of the proper allocation of the burden of proof. The jury was instructed in pertinent part as follows:

"In this matter Mr. Cotty has raised a defense of self-defense. A person may defend himself or herself whenever they reasonably believe that they are in imminent danger of bodily harm at the hand of another. A person under the law need not wait for the other person to strike the first blow. This right is what is called self-defense. A person may claim the right of self-defense only if you find the following: One, * * * [t]hat he actually believed that he was in imminent danger of bodily harm, and

**14.** The charge in *Kittell* read in pertinent part as follows:

"I am instructing you that the law of self-defense holds that a person who instigates the combative confrontation cannot invoke the doctrine of self-defense. * * * Rather, where there is evidence of self-defense, and *you determine from the facts that the defendant was entitled to invoke the doctrine of self-defense,* the state must prove to each of you beyond a reasonable doubt that the defendant did not act in self-defense." *State v. Kittell,* 847 A.2d 845, 849 (R.I. 2004).

secondly, that he had reasonable ground for his belief. The question is not whether in hindsight the amount of force that Mr. Cotty used was necessary. Rather, it is whether Mr. Cotty, under all the circumstances which you find to have existed at the time of the incident as they appeared to him, actually did— he actually believed that he was in imminent danger of bodily harm and could reasonably maintain that belief.

" * * *

"You have heard conflicting testimony as to whether or not Mr. Cotty was the aggressor in this incident. As the finders of fact, you must determine from the evidence that you have before you whether, in fact, Mr. Cotty was the aggressor. I am instructing you that the law of self-defense holds that a person who instigates the combative confrontation cannot invoke the doctrine of self-defense. *The defendant, Mr. Cotty, is not required to prove that he acted in self-defense.* Rather, where there is evidence of self-defense and you have determined from the facts that Mr. Cotty was entitled to invoke the doctrine of self-defense, *the State must prove to each of you beyond a reasonable doubt that Mr. Cotty did not act in self-defense.*" (Emphases added.)

Following the charge, counsel for the defendant raised an objection to the self-defense instruction, and then the trial justice reiterated to the jury in the following instruction that the burden of proof lay with the state:

"The issue of self-defense, in the law for the offenses that Mr. Cotty has been charged with, in the law we consider this to be an absolute defense. If you find from your consideration of all the evidence that the State failed to prove that Mr. Cotty did not act in self-defense, then you should so indicate [on the ver-

dict form]. If you find that the State has failed to prove Mr. Cotty did not act in self-defense, then that would be your ultimate decision, and you need not go any further in your deliberations."

It is our opinion that the jury instructions in the present case, like those in *Kittell,* clearly and accurately indicated where the burden of proof lay. Our examination of the challenged language in the self-defense instruction, when viewed in the context of the instructions as a whole, leads us to conclude that no reasonable juror could have believed that the defendant was required to prove any element of self-defense. Consequently, we reject his argument that the trial justice's instruction with respect to that issue was defective.

### Conclusion

For the reasons set forth in this opinion, we affirm the judgment of conviction. The record may be returned to the Superior Court.